# SUPREME JUDICIAL COURT,

#### FOR THE

## COUNTY OF ESSEX, OCTOBER TERM, 1820, AT SALEM.

------◆------

PRESENT:

Hon. ISAAC PARKER, Chief Justice.
Hon. GEORGE THATCHER,
Hon. CHARLES JACKSON,
Hon. SAMUEL PUTNAM,   } Justices.
Hon. SAMUEL S. WILDE,

------◆------

The President, Directors and Company of the Salem Bank *versus* the President, Directors and Company of the Gloucester Bank.

#### Same *versus* Same.

Of the liability of an incorporated banking company, upon notes purporting to be their notes, and which, after the cashier had signed them, had been stolen, and the signature of the president forged. [Such notes are not binding upon the company until they be signed by the president; and if before they be signed by the president, they be stolen, and the name of the president forged and subscribed to them, and they be negotiated, the bank are not in any way responsible to a *bonâ fide* holder.—Ed.]

Assumpsit on a great number of promissory notes, alleged to be made by the president, &c., of the *Gloucester* bank, payable to the bearer thereof, and signed by the president; with averments that the plaintiffs were the legal bearers thereof, and that they had been

presented at the bank for payment, and payment refused. **There** were also counts for money paid, and for money had and received.

Trial was had at the sittings after the November term, 1818, upon the general issue, before the chief justice; and the defence was, that the notes described in the declaration were not the notes of the bank, not having issued therefrom, and not being signed by the president. The plaintiffs having produced in evidence notes corresponding with those declared on, proved by a Mr. [ * 2 ] *Russell*, who was in * their employment, that on Monday, the 16th of February, 1818, he carried to the *Gloucester* bank, by order of the directors of the *Salem* bank, notes of the *Gloucester* bank for payment, to the amount of 5000 dollars, among which were the notes declared on; that on his presenting them, the president, cashier, and some of the directors, took the parcel from him, and having counted and examined the notes, intimated something about counterfeits. *Russell* told them, if any of those brought by him were counterfeit, he wished them to be returned to him; but they appeared satisfied with them. The directors showed several of the notes to the cashier, to know if they were genuine, who replied that he had filled them up and signed them, and that they might as well dispute any of their notes as those. The president gave his opinion that they were all good, and said he would take them in payment for his private debts. After some hesitation, the directors and cashier separated the notes, placing those which had an old appearance, and about which there was no question, in one parcel, and the new ones in another. They paid Mr. *R.* for the former ones, and returned to him the others; observing that they returned them, not because they were counterfeit, but because they thought it prudent so to do. Among those returned were the notes now in suit.

Mr. *Moriarty*, cashier of the *Salem* bank, testified that he went to *Gloucester*, with the notes brought back by Mr. *Russell*, on the 26th of the same February, to procure payment; but the cashier and directors then refused to look at them; the president again saying that they were not returned because they were counterfeit.

It was proved that all these notes came into the *Salem* bank in the ordinary course of business, on a valuable consideration.

It appeared that all the notes produced in evidence were genuine in every respect, except the signature of *John Somes*, the president, which the defendants alleged to be counterfeit; the notes [ * 3 ] having been all filled up, as they * appeared at the trial, by the cashier, upon paper procured by the bank, properly stamped with the stereotype plates, and having the water-mark of the *Gloucester* bank; and the name of the cashier subscribed **to**

2

each by himself. Mr. *Somes*, who was the president at the time the notes bore date, died in August, 1816. There was no direct evidence of his having signed these notes; but the judge considered the circumstances above mentioned as *primâ facie* evidence, throwing the burden of disproving the signature upon the defendants.

The defendants then called Mr. *Allen*, their cashier, who testified that the notes were all filled up by him about the time they bore date, but were never signed by Mr. *Somes*, nor issued from the bank; that the notes, which had been so filled up and signed by him, were in sheets locked up in a desk in the business room of the bank, the key of which desk was always kept by himself; that these notes were stolen from the desk, by means of false keys, in October, 1817, as he supposed, and the name of the president forged by some persons unknown. These notes were dated either July 1st, 1814, or April 25th, or May 1st, 1815, and were filled and signed by the cashier, in pursuance of votes of the directors, specifying the numbers, denominations, and payees. The reason that the president did not sign them was, that he was in ill health, and seldom went to the bank. When he came, the cashier took from the desk such a number as he felt able to sign; and when they were so signed, credit was given to the bank for the amount, without specifying the numbers. The bank had no schedule of the notes of those dates which were signed by the president, nor could the numbers of them be ascertained.

The cashier stated that he could ascertain, by the books of the bank, the whole amount of notes ever issued by them, the amount destroyed, and the amount in circulation. He also stated that he could tell the number of all the notes issued by them, except those bearing the above-mentioned dates; and the reason of his not being able to *tell the number of those was, that the [ * 4 ] president died before he had signed all that were filled up. He said the amount of the notes stolen was 24,119 dollars, which he ascertained by the blank paper purchased, by the notes signed by the president as entered in his memorandum book, by his own book, wherein he entered the notes he signed, and by the books of the bank, in which the amount signed was credited. The notes in suit were of the above dates; but it did not appear, by any register or schedule, whether they were among those signed by the president, or not.

The cashier also testified that an attempt had been made upon the vault of the bank, but without success; marks of violence having been discovered about the door.

On Sunday evening, February 15th, 1818, he received information from certain brokers in *Boston*, that some false notes of the

bank were in circulation, which information he immediately communicated to the directors. On the next day, when the notes in suit were presented, the directors were ignorant of the circumstances or manner of the fraud; but upon seeing the cashier's signature to the notes, and the paper and impression being genuine, they believed them good, and did not examine the hand-writing of the president. This was the reason of their not declining to pay the notes on the ground of their being counterfeit; they only intending to suspend payment until they should receive more information. On the night of the 16th of February, information was received, which satisfied the directors that the notes prepared for the president's signature, as before mentioned, were stolen from the desk; but not being able to ascertain, from any books or papers in the bank, which notes were good, and which bad, a committee of three persons well acquainted with the hand-writing of Mr. *Somes* was appointed, one by the bank, one by some holders of notes of the doubtful dates, and one by those two, to designate those which were bad; and those now in suit being found bad by that committee, the cashier gave notice to the *Salem* bank, on the 18th of July, 1818, that those notes were counterfeit, and would not be paid.

[ * 5 ]   *This was the first notice given to the *Salem* bank of the absolute denial to pay the notes. Several letters, however, were previously written to the *Salem* bank, requesting their concurrence in the appointment of the said committee, which was declined. It also appeared that, several days before the said 16th of February, the defendants received of the *Salem* bank 8500 dollars of the *Gloucester* bank notes, about 3000 dollars of which the defendants averred had not the president's genuine signature.

The cashier also testified that the notes before mentioned remained in the desk from the year 1814 to October, 1817; that he kept them in that place, because, from the dampness of the vault, they could not be kept there for any length of time; that after Mr. *Somes's* death in 1816, the directors and himself proposed to destroy those which were filled up in Mr. *Somes's* lifetime and prepared for his signature; but the matter was forgotten; that about half of the whole quantity of bank paper in the desk was stolen, viz., 14,420 dollars of notes not filled up, and 9699 of notes prepared for the president's signature; and that he had no suspicion of the paper being missing, until the 16th of February, 1818.

The bank was closed for a month after February 16th, and in the mean time the directors resolved not to pay any of those notes, until they had been examined by the committee appointed as above mentioned, except such as the holders should swear were received by them from the bank, and they gave public notice accordingly.

SALEM BANK *vs.* GLOUCESTER BANK.

The said cashier and two of the said committee testified that they were well acquainted with the hand-writing of Mr. *Somes*, and they concurred in the opinion that the signatures to these notes were not his hand-writing; and they specified certain marks, as differences between these and the genuine signatures of the president. Their testimony on this point was not contradicted, except by Mr. *Moriarty*, who swore that he believed some of the signatures were Mr. *Somes's* hand-writing. But he did not designate *any such signatures, and had never seen Mr. *Somes* write. [ * 6 ]

Two of the said three witnesses, however, at a former examination of the notes, had thought some of the notes good, which they afterwards pronounced to be bad; but they attempted to account for this, by stating that, in the former examination, they had in view principally the signature, as supposed to have been forged by one *Wheeler;* and it afterwards appeared, as they stated, that some of the forgeries were committed by other persons, which induced them to determine some signatures to be forged, which they had before considered genuine.

It appeared that these witnesses differed in opinion from Mr. *Kittredge,* the then president of the bank, as to the genuineness of the signatures, in several instances; and one note was produced at the trial, which was proved to have issued from the bank, payment of which had been refused upon the ground of its being counterfeit, and it was marked as such at the bank.

It appeared in evidence that it is the custom of all the banks in *Boston,* and also of several other banks in *Salem* and in other towns in this county, to keep a register of all the notes issued by them, with the numbers and checkmarks; and that the sheets of paper for bank notes, remaining in an unfinished state, are always put into the vault, and kept there with the same care as their money, until finished and put into circulation.

On the foregoing facts, the plaintiffs insisted that they were entitled to recover,

1. Because there was sufficient legal proof that the notes in suit were issued by the defendants and signed by the president.—On this point the jury were instructed, that the notes being in circulation, with the genuine signature of the cashier, and having been made by the bank with their plates and bank paper, they must be taken to be the notes of the bank, unless the contrary was proved; that the testimony as to the hand-writing of Mr. *Somes* was * positive and clear against them; and that, as the [ * 7 ] plaintiffs had not gone into proof, by comparison of hands with the genuine signature of Mr. *Somes,* the jury might presume that such comparison would be unfavorable; and that this was

1                                5

SALEM BANK *vs.* GLOUCESTER BANK.

entirely a matter of fact for them to decide upon the whole evidence.

2. It was insisted that the manner in which these notes were kept in the bank, especially after Mr. *Somes's* death, and the carelessness of the cashier, were such as to charge the company with the notes, as made or put into circulation by them, even if stolen from the bank, and the name of the president afterwards forged. On this point the jury were instructed, as matter of law, that, admitting the carelessness of the cashier, and that there was such negligence as was stated, the corporation was not answerable therefor to the holders of the notes.

3. It was insisted that the conduct of the directors and cashier, when the notes were presented for payment, their delay in declaring the notes to be counterfeit, their issuing and paying some notes which were counterfeit, and the other facts appearing in evidence, amounted to an adoption of the notes, and made the corporation liable in law to pay them, whether counterfeit or not ; and particularly, as the directors and cashier ought to have had the means of knowing whether the notes were genuine or not, by keeping a register of all notes issued, their hesitation and delay ought to charge the corporation with the notes. On this point the Chief Justice instructed the jury against the plaintiffs, and particularly that the defendants were not answerable for the loss which had happened to the plaintiffs by reason of any omission of the cashier of the *Gloucester* bank to keep a register of notes issued ; and the jury were directed, if they were satisfied the notes were not signed by the president, to return a verdict for the defendants ; on the ground that there was not sufficient evidence, in point of law, to authorize them to find a verdict against the defendants.

[ * 8 ]    * The jury returned a verdict that the notes were not signed by *John Somes*, the president ; and the Chief Justice thereupon directed a general verdict for the defendants to be entered.

A new trial was moved for by the plaintiffs, on the ground of a misdirection to the jury ; and because of the several opinions in matter of law before stated.

---

An action of the case was also pending at the same term, between the same parties, for negligence of the defendants ; in consequence of which certain bank notes were taken from the bank, and the name of *John Somes*, president, put to them by some persons unknown ; and part of the same notes came afterwards to the hands of the plaintiffs for a valuable consideration ; and when the same were presented by the plaintiffs for payment to the defendants,

SALEM BANK *vs.* GLOUCESTER BANK.

they could not determine whether they were, or were not, issued by themselves; and they refused to pay the same.

In this action the general issue was joined, and it came on for trial. The plaintiffs having no other evidence than was produced in the former action, the Chief Justice directed a nonsuit, subject to the opinion of the Court upon that evidence.

Both the causes were argued together at the last November term in this county, and afterwards continued for advisement to this term.

*Pickering*, *Webster*, and *Nichols*, for the plaintiffs. There are two points in question. 1. Whether the conduct of the defendants amounted to an adoption of the notes. 2. Whether the defendants are not answerable for the negligence of their officers; and if so, whether on that account they are not liable in one or the other of these actions.

I. These notes were presented for payment, February 16th, 1818; and although they were not paid, the officers of the bank gave the plaintiffs reason to expect the payment; nor did they declare a different intention until five months *after. This [ * 9 ] unreasonable delay amounts to an adoption. The defendants are bound to know their own notes, and to give an immediate and decisive answer to *bonâ fide* holders. All well-conducted banks are able to do this.

This delay was injurious to the plaintiffs. It diminished their chance of recovery of those persons from whom they received the notes. Those persons might have failed or absconded; or the evidence of the receipt of the bills might be lost, in consequence of the lapse of time; or the plaintiffs' remedy over might be lost, by reason of the persons, who passed the bill to them, having lost *their* remedy over by this delay.

It is not necessary for the plaintiffs to show that they have actually sustained a damage. It is enough that the Court see that their *chance* of recovery is lessened. In the case of *Smith* vs. *Mercer* (1), *Dallas*, J., says, "The effect of the delay has been to give him an extended credit; and how am I able to say that his situation may not have undergone such a change, as to render him incapable of paying what he could have paid upon proper notice and demand? Nor do I think it will be an answer to observe that nothing of this sort is stated in the case; for the plaintiffs had no right to cast upon him the burden of such proof. The ground, therefore, on which I rest my opinion, is the want of due caution."

The defendants have, by their conduct, become parties to these

(1) 6 *Taunt.* 81

notes. By their delay to decide whether they were genuine; by the declaration of their cashier, when they were presented, that they were good notes; by his previous payment of similar notes; and still more by their suffering them to get into circulation, with the cashier's signature in nature of an attestation upon the genuine bank paper,—they ought to be estopped from denying that they were signed by the president. The case of *Barber* vs. *Gingell* (2) is not so strong as this. There the defendant had only accepted similar bills: here the defendants have treated these very bills as [ * 10 ] their own. There the defendant *was permitted to give evidence of a forgery, because, when the bill was first presented, he did not look at it: here the defendants looked at the notes and examined them. Yet in that case Lord *Kenyon* said that the defendant's having paid similar bills was an answer to the case of forgery; for although he had not accepted the bill, he had *adopted* the acceptance.

On the authority of *Price* vs. *Neale* (3), there is no doubt that, if the defendants had paid these notes, they could not recover back the money. The reason, as given by *Gibbs*, C. J., in *Jones* vs. *Ryde & Al.* (4), is, that if the plaintiff had decided at once, the defendant might have recovered back from the person of whom he had the bill.

The right of the *bonâ fide* holder in such cases does not rest on the maxim, *Melior est conditio possidentis.* It arises from this, that the conduct of the defendants has placed the plaintiffs in a worse situation. Therefore, according to the case of *Leach* vs. *Buchanan* (5), if one's name be forged, and he, not knowing of the forgery, promise a *bonâ fide* holder to pay the note, he is holden by this promise. In *Young* vs. *Adams* (6), *Sewall*, J., mentions it as the strongest ground for the decision in *Price* vs. *Neale*, that the plaintiff's acceptance and payment of the forged bills, considering them as drawn by himself, was his own peculiar negligence, by which the loss had been incurred; and, therefore, it was not to be thrown back upon the innocent holder of the bills. In *Markle* vs. *Hatfield* (7), *Kent*, C. J., says, the decision in *Price* vs. *Neale* turned upon the negligence imputable to the one party, and not to the other.

The case at bar is stronger against the defendants than *Price* vs. *Neale*. There *Price*, the drawee, was charged, because he did not know the signature of the drawer, his correspondent : here the defendants were ignorant of their own signature. In that case, one of the bills derived no credit from the acceptance, being negotiated

(2) 3 *Esp. Rep.* 60.  (3) 3 *Burr.* 1354.  (4) 5 *Taunt.* 488.
(5) 4 *Esp. Rep.* 226.  (6) 6 *Mass. Rep.* 187.  (7) 2 *Johns.* 462

before the other, and not presented until due: here the notes were *taken on, the credit of the defendants, and retained, [ * **11** ] from a reliance on their credit, until July 16th, 1818.

The signatures of the cashier upon the notes must be considered as an acknowledgment, by the defendants to the public, that the signatures of the president were genuine ; and as an admission to that effect by their authorized agent. This gave an additional credit to them.

The general rule is, that the admission of agents, respecting transactions connected with their agency, binds their principals. Thus the admission of an agent, through whom a debt had been contracted, has been held sufficient to take it out of the statute of limitations. The cashier in this case was the agent of the defendants, and they must be bound by his admissions (8).

But although the rule is not universal, that the words of an agent affect the principal, as if they were his own words, yet it is a universal rule, that the acts of the agent, in discharging his agency, bind the principal (9). In the present case it is the acts of the agent on which we rely. His delaying to decide, his paying other notes, and his declaration that these were good, creating a confidence and reliance on the part of the plaintiffs that these notes would be paid ; all this is much stronger than the naked assertion or admission of a fact.

From the language, in which the judge who tried the cause delivered his opinion to the jury, it seems not to have been left to them to consider whether these acts amounted to an adoption of the notes. For they were instructed to find for the defendants, unless they believed that the notes were actually signed by the president. The question, therefore, is, whether any acts of the directors and cashier would make these notes binding on the corporation.

II. The defendants are answerable for the negligence of their cashier, either in the action upon the notes, so as to estop them from denying them to be genuine ; or in the action on the case for negligence. Upon this point, three questions may be considered. 1. How far principals are *liable for the [ * **12** ] torts of their agents. 2. Whether there be any difference, in this respect, between the liability of corporations and that of in dividuals. 3. Whether the injury in this case be not too remote.

1. It is too clear to be questioned, that in general the principal is answerable for the negligence of his agent in a civil suit. Lord *Holt* says, " Where a trust is put in one person, and another, whose interest is intrusted to him, is damnified by the neglect of such as

(8) 2 *Esp. Rep.* 511.—5 *Esp. Rep.* 145.　(9) 10 *Ves. jun.* 123, *Fairlee* vs. *Hastings*

that person employs in the discharge of that trust, he shall answer for it to the party damnified " (10). A master is responsible for the unskilfulness or negligence of his servant, although not under his immediate direction, and although he had no power to prevent it (11). A smith, whose servant injures a horse brought to him to be shod—a surgeon, whose servant treats a patient with want of skill—are liable for the injury (12). Or if a servant exercise an unruly horse in an improper place (13) ; or by negligence in keeping a fire used in his master's service ; and in many other similar cases (14). And although the injury be not occasioned by the person immediately employed, but by another employed under him, yet the first employer is answerable (15).

And not only are principals answerable for the negligence or nonfeasance of their agents, but also for frauds committed by them without their authority, if done in their employment (16). And the reason is, that the employment afforded them the means of committing the injury.

For his servant's negligence and nonfeasance the master is liable, on the ground that he ought to be responsible for those he employs. In such cases the master alone is answerable, and no action lies against the servant. But for a misfeasance an action will lie against a servant or deputy, though not as such servant or deputy, but as a wrong doer (17). In the case at bar, however gross the negligence, or however palpable the injury to the plaintiffs, they can [ * 13 ] maintain no action against the cashier ; because * he acted only as servant to the defendants. In cases of negligence of an agent, the law holds the principal so completely answerable, that it may be laid in the declaration as his own negligence (18).

2. Does it make any difference that this action is against a corporation ?—If there be any difference, it would seem to be in favor of this action ; because corporations can act only by their constituted organs and agents ; and if they were not answerable for the acts of such agents, they could be answerable in no case. Corporations are liable, as well for torts as on contracts (19). The action of *Gray* vs. *The Portland Bank* (20), was maintained upon the

(10) 12 *Mod.* 490.                    (11) *Pothier on Oblig.* § 121.
(12) 4 *Back. Abr.* 584.               (13) 2 *Lev.* 172.
(14) 1 *L. Raym.* 264.—6 *D. & E.* 661.—8 *D. & E.* 188.—1 *Wils.* 282.
(15) 1 *B. & P.* 409.—4 *Taunt.* 649.
(16) 1 *Str.* 653.—1 *Camp.* 127.—1 *East*, 106.—1 *Taunt.* 568.—*Sayer*, 41, 42.—
1 *Strange*, 505.—12 *Mod.* 521
(17) 12 *Mod.* 488.—*Cowp.* 403.—1 *Wils.* 323.
(18) 6 *D. & E.* 659.—2 *Campb.* 450, 604.—3 *East*, 601.
(19) *Hub. Præl.* 662.                  (20) 3 *Mass. Rep.* 385.

ground that the corporation was liable for a failure of duty in their agents, the directors; and the same principle is recognized in various other cases (21).

The question is simply this, whether *case*, being but an ex tension of *trespass*, will lie against a corporation, there being certain ancient *dicta* that trespass would not lie against corporations, on the ground that corporate bodies could not be guilty of a trespass or tort.

This subject seems to have been fully discussed in this Court in 1810, in the case of *Riddle* vs. *The Proprietors of the Locks and Canals on Merrimack River,* just cited; in which it was decided that such action would lie. Two years afterwards, the same question arose in the King's Bench, in *Yarborough* vs. *The Bank of England,* also cited above, and was decided in the same manner. The reasons of Chief Justice *Parsons* and of Lord *Ellenborough,* in the two cases, are extremely analogous. They both trace the notion of a contrary doctrine to the same source, *viz.,* an opinion of *Thorp,* J., in 22 *Ass. pl.* 67, that trespass would in no case lie against a corporation. But this opinion, as to certain trespasses, has been repeatedly overruled in *England,* as appears by the cases cited by both those learned judges.

3. The injury complained of in the present case is not so remote a consequence of the defendant's negligence, * that an action of *assumpsit* upon the notes or *case* for [ * 14 ] the negligence may not be maintained. As to *assumpsit,* if it be objected that negligence can in no case amount to a promise, but that the remedy must be by a special action on the case, it may be answered, that if the defendants, by their want of due caution, suffered the notes to get into circulation with the genuine impression, filled up and signed by the cashier, they ought not to be permitted to say to *bonâ fide* holders that they are not the genuine notes of the bank.

If an action of *assumpsit* will not lie, the plaintiffs have a right to recover in the other action. In consequence of the negligence of the defendants in the mode of keeping their notes, and of their not deciding upon them when they were presented, the plaintiffs have lost the amount which they honestly paid for them. Nor is the injury too remote a consequence of this negligence. However

(21) 7 *Cranch,* 299, *Bank of Columbia* vs. *Patterson.*—2 *Johns.* 283, *Steel* vs. *West Inland Navigation Company.*—12 *Johns.* 231, *Danforth* vs. *Schoharie Turnpike Corporation.*—7 *Mass. Rep.* 169, *Riddle* vs. *Proprietors of Locks, &c.*—10 *Mass. Rep.* 397, *Hayden* vs. *Middlesex Turnpike Corporation.*—16 *East,* 5, *Yarborough* vs. *Bank of England.*—6 *Johns* 90, *Townsend* vs. *Susquehanna Turnpike.*—*Doug.* 524, *Rex* vs. *Bank of England.*—1 *P. Will* 395, *Ekins* vs. *East India Company.*—See also 2 *Brown's P. C.* 382.—3 *Campb.* 403, 417.—9 *Mass Rep.* 250.

remote an injury may be, if it in fact results from the defendant's wrong, he is liable to make it good in an action of the case.

This is called a liberal action ; nor is it any objection that it was never brought before (22). It is a universal remedy, given for all personal wrongs and injuries without force. Where an act is done, which is in itself an immediate injury to another, the remedy is usually by action of trespass *vi et armis ;* but where there is no act done, but only a culpable omission, or where the act is not immediately injurious, but only by consequence or collaterally, there no action of trespass *vi et armis* will lie, but an action on the special case for the damages consequent on such omission or act (23).

All losses and damages which may happen by the act of any one, whether arising from his imprudence, folly, ignorance of what he ought to know, or other like faults, however slight, ought to be repaired by him whose imprudence or other fault has occasioned them (24).

[ * 15 ] When damage happening by an accident is preceded *by an act which has caused the accident, it is by the quality of the act, and by its connection with what has happened, that it is to be decided whether the author of the act is to be charged or discharged (25) ; and no injury is too remote, if it can be shown to have certainly followed the fault complained of.

It is said by *Ashurst,* J., in the case of *Lickbarrow* vs. *Mason* (26), " We may lay it down as a broad general principle, that wherever one of two innocent persons must suffer by the act of a third, he who has enabled such third person to occasion the loss, must sustain it." The cases on this point are numerous.

If any damage, more or less, has resulted, or is likely to ensue, from the wrongful act of another, an action lies. The degree is wholly immaterial. Nor does the law require, in every case, actual proof of damage. Probable evidence of injury is sufficient, unless the defendants show the contrary (27). Thus, if one raise a new market near an ancient one, the owner of the first shall have an action, although it be not certain that any cattle would have come to his market, if the new one had not been there (28).

It is not material that the plaintiff had no particular interest in the subject matter at the time of the wrongful act. If he is injured afterwards and consequentially, it is sufficient. As if one neglects to place a buoy over a lighter sunk in the river, he is answerable for subsequent accidents (29).

(22) *Bac. Abr. Title, Actions on the c**.*
(24) *Domat. Civil Law, lib.* 2. § 4. *art.* 1
(26) 2 *D. & E.* 70.
(28) *Ibid.* 948.

(23) 3 *Black. Comm.* 122, 123.
(25) *Ibid. Lib.* 2, *Tit.* 8, § 9.
(27) *L. Raym.* 955.
(29) 1 *Campb.* 517.

Nor does it make any difference that the immediate cause of the injury was even the felony of a third person ; provided the negligence of the defendant gave the felon an opportunity to commit the injury.    Upon this principle, innkeepers, common carriers, bailees, &c., are answerable for goods stolen.    The case of *Herbert* vs. *Paget* (30) is similar in this respect to the case at bar.    There an action of the case was sustained against the keeper of writs and records, for keeping them so negligently that the plaintiff's record was altered.    So in *Dickson* vs. *Clifton* (31), the defend-
ant, * who was master of a vessel, was liable in case for  [ * 16 ]
negligently suffering goods to be embezzled.

Although the defendant be a private individual, and the act done relate wholly to his own property immediately, yet if there be negligence, and damage ensue, he is answerable in case (32).

It is not necessary that the act complained of should immediately affect any vested right of the plaintiff.    It is enough, if it interrupt his lawful pursuits.    Thus it was held actionable, by Lord *Kenyon*, to frighten away the natives on a foreign coast, so that they would not trade with the plaintiffs (33).

Many cases might be cited, where the injury complained of was as remote as the present.    Thus in *Kettle* vs. *Hunt* (34), a wheelwright brought a special action on the case for taking away his axe, by which he lost his livelihood.    The court held the action well brought ; because the damages being special, the action ought to be special.    So in *Scott* vs. *Shephard* (35), which was for throwing a squib, which passed through several hands before it struck the plaintiff.    So in slander, words not in themselves actionable, may be the subject of a suit ; if any damage, such as loss of marriage, loss of a legacy, or loss of society and hospitality, has ensued.

It is conceded that cases frequently happen, of injuries resulting indirectly from the omission of others, where no action will lie ; as if a man should have a key, which would unlock his neighbor's door, and should carelessly expose it, so that it was stolen and his neighbor's house opened with it ; or if one should carelessly leave a sword in his entry, and an assassin should take it and commit murder.

The answer to these cases is, that the owner of the key or the sword was under no obligation to keep them more securely.    He therefore did no wrong in thus leaving them.    But in the case at bar, the defendants were under an obligation to the public,

(30) 1 *Lev.* 64.                                    (31) 2 *Wils.* 319.
(32) 1 *Starkie,* 287, *Dixon* vs. *Bell.*—9 *East,* 277, *Townsend* vs. *Wathen.*
(33) *Peake,* 205, *Tarlton & Al.* vs. *M'Gauley.*              (34) *Bull. N. P.* 78.
(35) 3 *Wils.* 403.—See, also, 1 *Mass. Rep.* 145, *Adams* vs. *Hemmenway.*—7 *Mass Rep.* 169.

[ * **17** ] and to every person who might· receive * their notes, to keep the materials, of which they were made, so secure that the public should not be imposed upon by receiving false notes for genuine. Banks are bound to exercise an extraordinary care and diligence in the conduct of their affairs. This is implied in their profession or business: public policy demands it of them; and the nature of the property, being always money, requires it. The public have a right to claim of them such a degree of care as will prevent any general injury, in consequence of the privileges given them by their charters. The commonwealth, in authorizing them to issue notes which were to become the circulating medium, parted with a portion of its sovereignty. This was a privilege which no individuals, nor any number of men, could exercise, without the permission of the government. The public good, therefore, requires of them that they exercise this power carefully.

Mr. *Perkins,* the inventor of the stereotype plate, was required by law to give a bond conditioned for the safe keeping of the plate Of what use is this to the public, if banks are not held to keep the impressions from the plates in safety ? If they are not bound to this, what was intended for a public benefit will become a public mischief. In truth, then, banks have not the absolute control of this paper to use it as they please. So far as the community is concerned in its being safely kept, they are mere bailees. They have no right to consider their sheets of blank paper unsigned, as common paper.

It was said by Lord *Mansfield* (36), that bank notes are money, as much as guineas, or any other current coin that is used in common payments as money or cash. If this be so, ought not the makers of them to take such care of their materials, that the public may not be imposed upon by receiving them as genuine when they are spurious. The great security of the community is in the quality of the paper and the stereotype plates, which all the banks are required to use, and which has hitherto completely [ * **18** ] * eluded the skill of counterfeiters. The paper and plate being genuine, the public have a right to presume, and do presume, that the signatures are also genuine; and much more, if the signature of the cashier is genuine, have they a right to rely on the truth of that purporting to be the president's.

The carelessness of the defendants in the present case was gross. It was in evidence that other banks preserve their unfinished notes with as much care as those finished, by placing them in their vaults. An unsuccessful attempt was made to enter the vault of the

(36) 1 *Burr.* 452.

defendants. Had this paper been deposited there, the mischief could not have arisen. But the defendants exposed it in a common desk in the public room for three years; and their only apology for not destroying it, after the death of the pres'dent, was that it was forgotten.

An objection was made by the plaintiffs' counsel to that part of the chief justice's direction, which stated that the evidence of the defendants, that *John Somes* did not sign the notes, being positive and clear against the plaintiffs, and the plaintiffs not having gone into proof, by comparison of hands, the jury might presume that such comparison would be unfavorable to the plaintiffs. But the Court said that the law was perfectly settled in this commonwealth, that comparison of hands was proper evidence to be submitted to the jury.

*Prescott* and *Saltonstall*, for the defendants, considered the questions in the order presented by the report of the chief justice.

1. They observed that, as to the proof by comparison of hands, they were prepared to show, had it been necessary, by an examination of all the cases, that the weight of *English* decisions was in favor of this evidence, and that it had been uniformly admitted here (37).

The defendants produced several witnesses whose positive testimony to the hand-writing of the president was
* not contradicted; and their not resorting to comparison  [ * 19 ]
of hands could raise no presumption against them. But
it was precisely the case in which the plaintiffs should have produced it (38). The plaintiffs have no reason to complain of this part of the charge of the judge. He left the question of the signature of *Somes* to the jury, as a matter of fact, to be decided by the whole evidence in the case.

A verdict for the plaintiffs would have been against evidence, and therefore a new trial should not now be granted. This motion is to the discretion of the Court, and they will not grant it when the merits have been fairly and fully tried (39).

2. The defendants are not responsible, in any form of action, for the supposed negligence of their officers.

Numerous authorities have been cited for the plaintiffs, to show that principals are answerable for the negligence of their agents or

---

(37) *Phillips's Evid.* 428.—*Peake,* 155.—7 *East.* 282, note (*a*).—4 *D. & E.* 497.—1 *Esp Rep.* 351.—*Swift's Evid.* 30.—10 *Mass. Rep.* 39.—4 *Day's Esp.* 273, note.
(38) *Swift,* ubi supra.
(39) 2 *D. & E.* 4.—1 *Mass. Rep.* 237.—11 *Mass. Rep.* 193. -2 *Caines,* 29.—3 *Johns.* 588.—10 *Johns.* 447.

servants. That they are liable for such negligence, while acting within the scope of their employment, it is not necessary, in our view of the questions before the Court, to deny.

Another point, to which many authorities have been produced, is that corporations, as well as individuals, are answerable for the negligence of their officers. How far, and in what cases they may be liable, we do not consider it material to consider. It can only be, however, while acting strictly within the scope of their authority derived from some statute, or vote, or act of the corporation. In the case of *Gray* vs. *The Portland Bank*, the directors acted under a vote of the stockholders. In *Yarborough* vs. *The Bank of England*, which was trover for certain bills, an authority from the bank to detain the bills was presumed to be proved. In *Riddle* vs. *The Proprietors of the Locks*, &c., *on Merrimack River*, there was a breach of a corporate duty, enjoined in the act of incorporation.

" If an injury happens to a man in his property by the neglect of another; yet if by law he is not obliged to be [ * 20 ] *more careful, no action will lie" (40). The cashier of the *Gloucester* bank was not required by any law, or by-law, or vote, to keep the blank and unfinished paper in any particular manner or place. The practice of other banks cannot be binding on this. Why should a corporation be responsible, when an individual would not be? Suppose the blank promissory notes of a merchant had been stolen in the same manner, and his name forged, would he be liable for, not keeping them more securely?

The plaintiffs contend that, as the negligence of the bank was the cause of the notes being in circulation, they ought not now to be permitted to deny them; in other words, that their negligence amounts to a promise. But how can negligence be the foundation of an action of *assumpsit* for the injury sustained? How can a tort be converted into a contract?

There was no such negligence in this case as should make the corporation liable in any form of action. The paper was always securely locked up, and its being kept in the desk so long is well explained by circumstances. The bank was not bound to keep a register of the bills issued. The charter prescribes no such duty. Where such a register is kept, it is for the convenience and security of the bank only. The defendants not keeping a register has been no injury to the plaintiffs. It would not have prevented the theft, or the forgery; but would only have been a readier mode of determining what the jury have decided on other evidence. But

(40) Vide *Bac. Abr. Action on the case*, C.

if the bank is required by law to keep a register, no particular form is prescribed, and a register has been kept *substantially* in the *Gloucester* bank from the beginning.

The declaration in the action for negligence does not set forth a sufficient cause of action; because the alleged carelessness of the cashier was no direct injury to the plaintiffs. The cause of the injury was not the manner of keeping the bills, or the not keeping a register, but the felony of others. The exposure of the bills could have * done no injury, except for the theft of   [ * **21** ] those who stole them, and the forgery of those who inserted the name of the president. They could not have obtained circulation in the state in which they were left in the desk; and to say that because they were kept in an insecure place, and some one stole them and forged the president's name, therefore the corporation is liable, is an inference not warranted by any case. The injury is a remote and disconnected consequence, not an *effect* of the alleged negligence. To be the foundation of an action, the negligence must be the *cause* of the injury complained of (41).

The instances cited to illustrate this action, are the keeping of a fire carelessly, so that a neighbor's house is burned; the shooting of a gun in the middle of a town, by means of which a horse starts and throws his rider, &c., where the injury, although not the immediate, is yet the direct consequence of the act. An action will not lie for an incidental damage. Suppose a man leaves his loaded gun exposed, and another takes it and wounds a third, would an action lie against the owner? Yet many arguments urged in the present case would apply to that. A man who keeps his gun is bound to keep it as others usually do. A sufficient answer would be, that the injury was caused by the intermediate act of others.

3. The conduct of the defendants does not amount to an adoption of the notes.

A ratification or adoption of an act, by which a person was not originally bound, must be with a knowledge of all the circumstances. In this case, when Mr. *Russell* presented the bills, if the directors thought some of them forged, and others not, but were uncertain which, and they postponed the payment of some, being uncertain whether forged or not, they cannot be held to the payment of the bills forged, on the ground of their adoption. They ought to have known the facts, whether forged or not. But as they only knew that counterfeit bills were in circulation, and not the particulars

(41) 3 *Wood Lectures*, 203.

their not denying absolutely to pay them cannot amount to an adoption.

[ * 22 ]  * There was nothing on the part of the directors and cashier, when the bills were presented, which should bind the corporation by adoption. Their conduct is explained by the circumstances stated by Mr. *Russell*. Why did they intimate something about counterfeit notes? Why did they think it prudent to delay payment? Why did they separate the new bills from the old? Because they knew that some forgeries were in circulation, and they suspended payment for the purpose of obtaining further information. Nothing could warrant an expectation in the plaintiffs that the notes would be paid, if counterfeit, but the contrary. When presented the second time, the directors and cashier refused to look at them, and soon after public notice was given that they would not be paid. If the plaintiffs have suffered from delay, it is their own fault. But the notes were taken in the usual course of business, and it could never have been ascertained from whom they were received.

The bank have not adopted these bills by issuing and paying others of the same description. Only one is proved to have been issued from the bank, and that has not been paid. It was issued inadvertently, and it would be a monstrous inference that the bank had adopted all such notes. The principle is, that where a person affirms the act of another repeatedly, as by paying forged acceptances, there he gives an authority to use his name. This was the ground of the decision in *Barber* vs. *Gingell*. The defendant had paid several bills forged by *Taylor*, who was his son, and connected with him in business. These acts gave a public credit to the bills drawn by *Gingell*.

The want of a register has given no credit to the notes in the case at bar, and cannot make the bank responsible for forged notes by way of adoption. Is it possible to infer that the bank undertook to pay all notes purporting to be theirs? In *Price* vs. *Neale*, by payment of the first bill, credit was given to the second, which was negotiated to the same party to whom the first was paid.

[ * 23 ]  But the * great distinction is, that the bill was actually paid, and the action was brought to recover the money back; and, therefore, the rule, *Melior est conditio possidentis*, applied *Smith* vs. *Mercer* was decided on the ground that, by the acts of the plaintiff, the defendant was prejudiced. In both these cases the plaintiff was the party who had paid, and upon whom the negligence, if any, rested ; and the Court decided that the loss should not be shift ed. In the last, *Chamber*, J., dissented, and considered the case of *Price* vs. *Neale* to be repudiated by the case of *Jones* vs. *Hyde & Al-*

18

No action can be maintained on the notes offered in evidence at the trial, without proof that they were issued by the bank as their notes, and with a view to adopt them as such. But there was no evidence that these notes, or either of them, were ever issued by the bank. The principal reason of the decision in the case of *Wyman* vs. *The Hallowell and Augusta Bank* (42), was the want of such proof. The chief justice says, "We are satisfied that no action can be maintained without proof that the bills were issued by the new corporation as their own notes, with a view to adopt them as such, instead of issuing notes of their own."——— "It would be inadmissible that the new bank should be made responsible for all the notes of the old company, because they had adopted and passed some of them as their own." That was a much stronger case for the plaintiffs than the present.

But if an action could be maintained, we doubt whether it could be on the notes themselves, and whether the party suing must not be the person who received them at the bank. There is no privity between the bank and a third person, to whom the notes were passed.

The corporation would not be liable for these forged notes, even if the directors had adopted them, and promised to pay them. The act of incorporation directs the mode in which notes shall be made, to be binding on the bank; and a body corporate can only act in the manner prescribed by the act creating it. A corporation is a mere *creature of the law. It derives [ * 24 ] from that all its powers, and it is subject only to the duties therein prescribed. A bank note is a contract between the corporation and the holder; but in what manner it shall be made to be binding is contained in the act of incorporation; and the corporation is bound to pay no other. The authority of the officers is limited by that, and the by-laws and votes regularly enacted and passed under it.

No injury can arise from this principle. These acts of incorporation are public laws. Public notice is thus given of the authority of the directors, that they are agents under a limited power, and that the corporations are not bound by any act of theirs, not within the scope of their authority.

By the common law, the contracts of corporations can be proved only by instruments under their seals. In modern times, other modes have been prescribed in acts of incorporation. In the act incorporating the defendants, it is provided, "that all bills issued by the bank, and signed by the president, shall be binding on the

(42) 14 *Mass. Rep.* 58

corporation." This signature is a substitute for a seal, and is as necessary as that would be at common law. The case of *Wyman* vs. *The Hallowell and Augusta Bank* goes far to establish these principles.

The case of *Head & Al.* vs. *The Providence Insurance Company* (43) is much in point. It was an action upon two policies of insurance, and the question was, whether one of the policies was vacated by a subsequent agreement. This depended on the question whether an unsigned memorandum, delivered by the secretary by order of the directors, was a corporate act, obligatory on the company. · Their manner of acting is thus defined in the act of incorporation. "All policies of assurance, and all other instruments, made and signed by the president of the said company, or any officer thereof, according to the by-laws or regulations of the said company, or of their board of [ * 25 ] directors, shall be good and effectual in law, to *bind and oblige the said company to the performance thereof." Chief Justice *Marshall* observes, "that a contract, varying a policy, is as much an instrument as the policy itself, and therefore can only be executed in the manner prescribed by law. A contract to cancel it, to become the act of the company, must be executed according to the forms in which by law they are enabled to act."

"It appears to the Court that an act, not performed according to the requisites of the law, cannot be considered as the act of the company, in a case relating to the formation or dissolution of a policy."

How then can an act of the directors and cashier of a bank, not performed according to the requisites of the law, be considered as the act of the corporation, upon a subject, on which the statute contains express provisions?

The same principles are recognized in the case of *Beatty* vs. *The Marine Insurance Company* (44). That case decides that a body corporate can act only in the mode prescribed by the law creating such corporation.

PARKER, C. J., delivered the opinion of the Court (45).

The first objection made to the verdict in this case is, that as the notes declared upon were made upon paper belonging to the *Gloucester* bank, were filled up and subscribed by the cashier, and were in all respects perfect, except in the signature of the president, and as they had got into circulation by means of the carelessness of the officers of the bank, they ought to be

(43) 2 *Cranch.* 127.         (44) 2 *Johns* 109.
(45) *Putnam*, J., did not sit in the hearing or determination of this action, being interested in the event.

considered as the notes of the corporation, even if the name of the president was feloniously put to the notes by some person into whose hands they fell; and that the jury ought to have been so instructed.

The judge considered the signature by the president essential to the validity of the notes, and so instructed * the [ * **26** ] jury; but that, under the circumstances, it was incumbent on the defendants to disprove the signature.

We think this opinion correct. The notes were incomplete unless signed by the president; the act of incorporation itself making that signature an essential circumstance to make the note evidence of a promise on the part of the corporation.

It is then objected that the observation of the judge, relative to the comparison of the supposed with the genuine signatures of Mr. *Somes,* the president, was incorrect, and had an unfavorable bearing against the plaintiffs.

But as it appears that witnesses were examined to the point, and divers specimens of the genuine hand-writing of *Somes* were proved by the plaintiffs, who had possession of those specimens, it was quite proper to remark to the jury that the presumption was, that a comparison would be unfavorable to the plaintiffs' cause on this point.

But a point more insisted on is, that the conduct, declarations, and doings of the officers of the bank were such as to render the corporation liable upon these notes, whether originally theirs or not. The directors, when the notes were presented, hesitated, but did not absolutely refuse payment; and they did not declare that they were counterfeit, but, on the contrary, seemed to believe they were genuine.

The case of *Price* vs. *Neale* was cited in support of the position, but does not maintain it. The money in that case had been paid by *Price* on a bill, in which the drawer's name was forged; and it was held that he should not recover the money back, because he was supposed to have knowledge of the drawer's hand-writing; and should have satisfied himself before he paid the money. By paying the money he lulled the holder of the bill into security, and probably deprived him of the opportunity of resorting to the person of whom he took it. It was held not to be against conscience in the defendant *Neale,* to retain the money, which had been voluntarily paid him. Had *Price* * accepted the [ * **27** ] bill, and been sued on his acceptance, he would probably have been held liable. But the case here is different. The notes are presented to the officers of the bank as the notes of their corporation. They do not pay, but hesitate, and finally decline

If they had known them to be forged, and had not declared the forgery as the cause of their refusal to pay, they might have been answerable on the ground of fraud, or perhaps of adoption. But they were as ignorant as the plaintiffs were, and hesitated with a view to obtain knowledge. This cannot be considered an adoption of the notes, and ought not to make them liable.

The cases in 3 *Esp.* 60.—4 *Esp.* 226.—2 *Campb.* 450.—6 *Taunt.* 76, may be considered as recognizing the principles of *Price* vs. *Neale*.

When, however, a man is taken by surprise, and acknowledges a signature to be his, which turns out to be forged, he may avoid any liability by proving the forgery; as in 3 *Esp.* 60, and 10 *Mass. Rep.* 39. In which latter case, although the reason is not stated in the opinion of the Court, it may be inferred from the facts proved, that the acknowledgment of the signature was hasty and inadvertent; and without doubt the age of the party attempted to be charged had some influence on the decision. But in either of these cases, had the money been paid, that would have been such a deliberate act, that, according to the general course of authorities, it may be doubtful whether it could have been recovered back, both parties being equally innocent.

There is another class of cases, having a close analogy to these, but yet admitting of a sensible discrimination; where the party having taken a false note or bill, seems to be entitled to indemnity from the party paying it, although wholly ignorant of the want of value of the paper, in which he made his payment. Thus, where a man who has purchased articles of merchandise, pays for them in counterfeit bank notes, he shall be held to make the [ * 28 ] vendor *good; because, in fact, he had not paid that which the parties believed to be money, or current as such, being of no value; as in the case of *Young* vs. *Adams*. So of a bill of exchange or promissory note discounted, which turns out to be a forgery, as in the case of *Jones* vs. *Ryde & Al.*

In cases like the first, the party contracts by implication to pay the value of the articles which he purchases, and fails to do it; and in the other case he undertakes to sell a thing of value, which turns out to be different from what it purported to be, and worthless. In these cases there is an implied warranty that the thing delivered is what it purports to be. Negligence, however, and delay, by which the innocent payee or vendee is prevented from seeking redress from antecedent parties, would be likely to affect the right of action; for after a reasonable time has elapsed, without any call or complaint, the receiver would be held to have waived his strict rights against a party wholly innocent.

According to the cases cited, it would seem, if upon presentation of the counterfeit bills to the *Gloucester* bank, they had paid, the money could not have been recovered back; because they were bound to know the proper bills of their own bank, and having received them as such, they must abide the loss, rather than throw it upon a party who had not the same means of knowing, and who took the bills as good. But payment was refused; and the question now is, whether the bills were so *acknowledged, recognized,* and *adopted,* as to make the corporation liable.

It has been seen that individuals may be held in such cases, if they countenance or adopt a spurious signature. There is a difficulty in applying the same rules to corporations. The directors are the agents of the company; the officers are its servants. The duties of both are pointed out by statute, or prescribed in the by-laws, which are the promulgated will of the company. *Acting within the limits of the authority thus given,* the company is liable for their acts; but beyond those limits, they cannot bind their * principals. Surely the promise of a cashier, made [ * **29** ] without authority, to pay a sum of money, for which the company had received no compensation, could not bind them; nor could the directors create such a liability. In such cases, the person dealing with the officers of a bank must be presumed to know the extent of their authority. If they promise more than they are authorized, they may be personally answerable, but cannot pledge their principals.

The various acts and declarations, which go to constitute adoption or ratification, are inferior evidence of a promise; and if a direct and express promise will not bind, any thing short of that cannot have a greater effect. The case of *Wyman* vs. *The Hallowell and Augusta Bank,* 14 *Mass. Rep.* 58, recognizes a distinction between acts of an agent for his principal in common cases, and similar acts done by the servants or officers of a corporation. And there is reason for this distinction; for in the first case, the extent of the authority is known only between the principal and the agent; whereas, in the latter, the authority is created by statute, or is matter of record in the books of the corporation, to which all may have access who have occasion to deal with the officers.

But even ordinary agents are limited by the authority expressly given, or growing necessarily out of the business transacted. Any thing beyond that is void as against the principal, unless ratified by him. Now, to show an analogy between officers of corporations and the agents of merchants or others, it should be shown, when any thing has been done beyond the plain authority delegated, that the corporation itself has done some act significative of approbation

or adoption. But nothing of the kind took place in the case under consideration.

In certain things the directors of a bank have all the authority of the corporation vested in them by a vote; and in respect to such things, the engagement, express or implied, of the body [ * 30 ] of the directors will bind the corporation. * But in matters not entrusted to them, their undertaking or assent cannot be binding upon any but themselves. Directors are not authorized to pay money for a bank which it does not owe; and, therefore, no act of theirs, tending to create an obligation to that effect, can be operative.

But even on the supposition that a direct engagement, or that acts or declarations on the part of the body of the directors, would amount to an adoption, by which the company was to be bound, the evidence reported falls much short of this condition of things; nothing having been done or said by any of the directors, tending to show a disposition to pay the notes, if forged ; nor were the circumstances known which made them questionable. If the plaintiffs have suffered by the equivocal conduct of the defendants, it is not entirely without fault on their side. For the refusal, or even the hesitancy to pay, furnished reason enough to look to those from whom the bills had been received.

We think, then, that on this point the direction to the jury was right. For although it was a question of fact whether there was an adoption or not, yet, as a verdict for the plaintiffs must have been set aside for want of legal evidence to support it, a new trial ought not to be granted.

Another ground of liability, *viz.*, the negligence of the officers of the bank in so keeping the paper prepared for the signature of the president, as that it was stolen and put into circulation with his name forged, was the subject of an action on the case, which for convenience has been argued as a distinct point of this case.

Whatever might be the opinion of the Court, in the case of a direct damage, happening to any one in consequence of the negligence or mismanagement of the officers of a bank; we are clear that, for the indirect and remote consequence of the [ * 31 ] negligence in this case, the corporation is * not answerable.

The notes, as they lay in the bank, were harmless, and could impose upon no one. They are in fact waste paper, until they receive the signature of the president. In this situation they are stolen, and they are made to resemble a bank note, by the felonious act of the thief, or of some person associated with him. Why should the corporation be answerable for notes thus fabricated ?

The negligence of their officers was the cause of loss to none but themselves; and it is only by superadding forgery to negligence, that harm is done. The negligence may be theirs, but the forgery is not; and it is not easy to see any equity in obliging them to pay for the crimes of another. As well may it be said that if a bank note be filled up by the cashier, intended to be issued as a one dollar note, and a space be left large enough to insert the word *hundred,* and the word be fraudulently inserted, it became the note of the bank for one hundred dollars.

There has been no case cited which maintains such a principle , and we perceive no ground for it in reason or justice. In all cases of negligence which are the foundation of actions, it is believed the injury complained of is the direct and immediate consequence of the fault. *Causa propinqua, non remota, spectatur.* If, because these notes, left carelessly in an unfinished state, were stolen, and the president's name forged to them, the corporation are bound to pay them; then, also, if the paper not filled up at all had been stolen and so used by the felon, the corporation would have been liable. But this would be strange doctrine. If a merchant should prepare promissory notes or bills of exchange for his signature, upon an expected contract, and should leave them in his desk, and some one should steal them and forge his name, can it be supposed he would be obliged to pay them? If not, why should a bank under similar circumstances be liable? The law is the same in this respect, for an individual and for an incorporated company.

Principals are generally liable for the misconduct of their agents, masters for that of their servants, but only [ * **32** ] for the direct effect of that misconduct. If, by the negligence of a merchant's clerk, property committed to his care be damaged or stolen, the merchant would doubtless be answerable; because the negligence is the cause of the damage, and he is bound, upon the principles of the contract of bailment, to take the best possible care of the goods so committed to him. But if his own property should be stolen and adulterated, so that a purchaser is cheated, can it be supposed that he would be answerable, because the mischief might be traced back to the negligence of his servants? Or, should he even be prevented from reclaiming the property stolen from him, if the purchaser could prove that the servants carelessly left open the door, by which the thief entered?

There is no instance in the books of any liability like that which is contended for in this case. The only case, which has any resemblance to it, is that of *Herbert* vs. *Paget,* 1 *Lev.* 64, where the keeper of the records was held answerable for an alteration in them, although made without his knowledge, and which he could not

prevent. But this was decided by two judges only against *Twisden;* and the two rested their decision upon the strict principle that the defendant, having undertaken as a public officer to keep the records at his peril, was answerable for them. But neither the cashier of the bank, nor the corporation, are public officers. The latter are merely copartners, authorized by law to act as a body, by a corporate name, and are no otherwise amenable to the public than as may be provided in their act of incorporation.

According to the principles of the cases cited, as well as the general principles of law applicable to the case before us, we are satisfied that the verdict is right in the action which was submitted to the jury; and that in the action between the same parties, which is case for negligence, the nonsuit was rightly ordered.

[ * 33 ]  ───◆───

*THE PRESIDENT, DIRECTORS AND COMPANY OF THE GLOU-
CESTER BANK *versus* THE PRESIDENT, DIRECTORS AND
COMPANY OF THE SALEM BANK.

> Where a banking company paid notes, on which the name of the president had been forged, and neglected for fifteen days to return them, it was held that they had lost their remedy against the person from whom the notes had been received.

ASSUMPSIT for money had and received. Trial was had on the general issue, November term, 1818, before the *Chief Justice;* when it appeared that on the 30th of January, 1818, the cashier of the *Salem* bank informed the cashier of the *Gloucester* bank, by letter of that date, that he had on hand, in notes of the *Gloucester* bank, above 8500 dollars, and wished an exchange for *Essex* or *Boston* notes. On Saturday, the 7th of February following, the cashier of the *Gloucester* bank drew a check on the *Boston* bank for 8500 dollars, which Mr. *Mansfield,* one of the directors of the *Gloucester* bank, took to *Salem* on the 9th of February, and delivered it to the cashier of the *Salem* bank, as he was going to *Boston.* He did not receive the *Gloucester* bank notes at that time, but took a check drawn by the cashier of the *Salem* bank for the same amount, to remain until Mr. *M.'s* return from *Boston.* On the 10th of February he saw the cashier of the *Salem* bank, who delivered him a package containing, as he said, 8500 dollars in notes of the *Gloucester* bank; upon which Mr. *M.* delivered to him the check