Berry *v.* Yates.

[NEW YORK SPECIAL TERM, April 28, 1857.　*Davies,* Justice.]

————o o o————

24　199
127a 257

## BERRY, receiver, &c. *vs.* YATES and PORTERFIELD.

On the 8th of November, 1855, the board of trustees of the Atlas Mutual Insurance Company adopted a resolution " that a subscription in the sum of $400,000, in premium notes to be written against, be obtained; subscriptions to be binding when $300,000 is subscribed, *including the $40,000 already subscribed.*" In pursuance of this resolution, the trustees prepared and circulated a paper, for signatures, in these words : " We the subscribers hereby agree to give to the Atlas Mutual Insurance Company our notes in advance of premiums of insurance, at six and twelve months, in equal amounts, for the sums set opposite our names respectively; it being understood that in consideration thereof the subscribers are to be allowed by the company, at the maturity of their notes, five per cent on the amount thereof.　This subscription is towards the $400,000 subscription authorized by a resolution of the board of trustees of this date, and *is not to be binding until the sum of* $300,000 *is subscribed.*"　The defendants subscribed to this paper, $1000, on the 8th of November; and on the same day, the trustees subscribed the sum of $50,000 to another paper, on the same conditions set forth in the above resolution, to be paid in cash or notes, at 30, 60, 90 days or four months, provided the sum of $300,000 should be subscribed *under that resolution.*　The subscriptions, under the resolution of November 8, exclusive of the $40,000 and the $50,000 subscriptions, amounted to only about $212,500.　In an action to recover one half of the defendant's subscription, the plaintiff claiming that the whole $300,000 had been subscribed, so as to make the defendant's subscription binding;

*Held,* 1. That the several subscriptions must be deemed separate and independent engagements, varying in amounts, terms and conditions; and that neither the $40,000 nor the $50,000 subscriptions could be resorted to, to aid in fulfillment of the terms of that for $300,000, or as forming any part thereof.

2. That the resolution of the board of trustees, of November 8, declaring that the subscription was to be binding when $300,000 was subscribed, "*including the $40,000 already subscribed,*" did not affect the rights of the defendants, or constitute any part of the contract.　That the rights and liabilities of the defendants were limited and defined by the terms of their subscription, only.

Berry *v.* Yates.

3. That the condition mentioned in the subscription paper, that $300,000 should be subscribed, must be complied with before the defendants could be made liable upon their subscription; and that, as the whole sum specified was not subscribed, independent of the $40,000 and $50,000 subscriptions, the action would not lie.

4. That the fair construction of the paper signed by the defendants was, that the same was not to be operative unless the entire sum of $300,000 should be subscribed thereto, on the same terms as were therein expressed, viz: in premium notes at six and twelve months, in equal amounts.

A corporation, created for the purpose of engaging in the business of insurance, has no power to advance its moneys or obligations to sustain another corporation engaged in a similar or dissimilar business.

Accordingly *held*, that an insurance company was not authorized to subscribe to the capital stock of a mutual insurance company, and to agree to give its notes in advance for premiums on insurances to be subsequently effected.

The authority given to insurance companies, to reinsure policies or risks taken by them, in other companies, does not justify such subscriptions by them.

A subscription to the capital stock of an insurance company, made by a similar company, under an agreement between the two companies for a mutual exchange of notes to a specified amount, is void, as being a fraud upon the other subscribers.

THIS action was brought by the plaintiff, as receiver, to recover one-half of an alleged subscription of the defendants to the capital stock of the Atlas Insurance Company. That subscription bears date November 8, 1855, and was for $1000, payable in six and twelve months, less five per cent, and this suit was brought to recover the sum of $475, due thereon May 11, 1856. The complaint alleged that the Atlas Insurance Company was an incorporated insurance company on the mutual plan, organized and doing business in the city of New York, and became insolvent, and on the 11th of March, 1856, the plaintiff was appointed receiver of its property and effects. That in pursuance of a resolution of the board of directors of the company, the trustees thereof caused to be prepared, and circulated a subscription for signatures in the words following: "We, the subscribers hereto, agree to give to the Atlas Mutual Insurance Company, our notes in advance of premiums of insurance, at six and twelve months, in equal amounts for the sums set opposite our names respectively, it being understood, that in consideration thereof, the subscribers are to be allowed by the company

Berry *v.* Yates.

at the maturity of their notes, 5 per cent on the amount thereof. This subscription is towards the $400,000 subscription authorized by a resolution of the board of trustees of this date, and is not to be binding until the sum of $300,000 is subscribed. New York, Nov. 8, 1855." The resolution of Nov. 8, 1855, referred to in the subscription, was as follows: "On motion it was resolved, that a subscription in the sum of $400,000 in premium notes to be written against be obtained—subscriptions to be binding when $300,000 is subscribed, including the $40,000 already subscribed." On the 30th of October, 1855, the trustees adopted the following resolution: "That any arrangement made by the finance committee in paying or arranging for funds to pay the pressing liabilities of the Co., and to sustain the institution until other means can be provided, if they shall make themselves or their friends personally liable, the same shall be considered and treated as confidential in any event, *equal in all respects to the amount of* $40,000 *already subscribed by the friends of the company for its relief.*" The complaint further alleged that the defendants, on 8th November, 1855, subscribed to the said subscription the sum of $1000, and that the said sum of $300,000 was subscribed in accordance with the terms of said resolution, and of said subscription. The plaintiff further alleged that the defendants had not given their notes, in accordance with said subscription, and that there was due thereon the said sum of $475, and interest from May 11, 1856. The defendants in their answer denied that the said sum of $300,000 was ever subscribed in accordance with the terms of said resolution or of said subscription. The defendants further alleged, that said sum of $300,000 was never subscribed in good faith; that many of said subscriptions were merely nominal; that they were made with the understanding that they were not to be binding; that the officers of the company made subscriptions which were merely nominal, and made for the purpose of procuring from *bona fide* subscribers their notes in accordance with such subscription.

*C. C. Egan,* for the plaintiff.

*Beebe, Dean & Donohue,* for the defendants.

DAVIES, J.   The terms of the subscription, and the testimony, conclusively establish the position that the subscription of the defendants was not to be binding unless the sum of $300,000 was actually subscribed.   It was incumbent on the plaintiff, as essential to his right to recover, to establish the fulfillment of the condition precedent—that this sum had been subscribed; and for this purpose he produces and proves the subscription book, which contains first, a statement under date of Nov. 8, 1855, in these words : " The trustees of the Atlas Mutual Insurance Company, in order to show their desire and determination to place the company in an independent position, do subscribe the amount set opposite their names, on the same conditions set forth in the resolution of the board of this date, to be paid in cash or notes, at thirty, sixty, ninety days, or four months, provided that the amount of $300,000 is subscribed *under that resolution.*"   Then follows the names of sixteen persons, and opposite thereto $50,000.   Next we have a copy of the subscription of $40,000, being that referred to, without doubt, in the resolution of October 30, 1855 ; and then succeeds the subscription of Nov. 8, 1855, already referred to, and which, in fact, only amounts to the sum of about $212,500.   Then follows a subscription amounting to $48,000, by the gentlemen who had agreed to subscribe $50,000, provided the $300,000 subscription was made up, and then other subscriptions amounting to near $6000.   The original subscription of $40,000 is produced, and bears date October 12, 1855.   The subscription which the defendants signed, and the engagements which they entered into, contains the significant stipulation that " this subscription is not to be binding until the sum of $300,000 is subscribed."   Now it is obvious from the date of the subscription of $40,000, and the terms of the engagement to subscribe $50,000, that they were both regarded as independent subscriptions to that for $300,000.

Berry *v.* Yates.

It is apparent to my mind, from the terms of the resolution of October 30, that an arrangement had been made that this $40,000 subscription was regarded as a confidential loan to the company.   The notes to be given to meet it were, by the terms of the subscription, to be at four months, while those under the subscription for $300,000 were to be at six and twelve months, and those under the subscription of $50,000 were to be met in cash or notes, at thirty, sixty, ninety days, or four months. These subscriptions must, in my judgment, be all deemed separate and independent engagements, varying in amount, terms and conditions, and that neither the $40,000 or the $50,000 subscriptions can be invoked to aid in fulfillment of the terms of that for $300,000, or as forming any part thereof.

I have not overlooked the resolution of the board of trustees of Nov. 8, 1855, in which they say that the subscription is to be binding when $300,000 is subscribed, including the $40,000 already subscribed.   It is sufficient to say that this is not the contract of the defendants.   The terms of the subscription signed by them contain no such provisions, but the emphatic one that it is not to be binding until the sum of $300,000 is subscribed thereto.   I am now considering the subscription of November 8, 1855, as containing what it purports, legal and valid subscriptions ; and the sums there appearing, disregarding those of the $40,000, and $50,000, amount to about the sum of $212,500. What is the effect of such a condition in a subscription ?   Undoubtedly that it must be complied with before the liability attaches.   Such is the agreement of the parties, and such are their legal obligations.

The rule, as I understand it, is well stated by Chancellor Walworth, in *Stewart* v. *Trustees of Hamilton College,* (2 *Denio,* 403.)   That was an action brought by the trustees of Hamilton College against Stewart, to recover from him a subscription to the funds of that institution.   The subscription contained a provision that the subscribers were not to be holden " to pay the sum subscribed by us, unless the aggregate of our subscriptions shall, by the 1st of July, 1834, amount to $50,000.   It was proven on the trial that the nominal amount of the sub-

scriptions equaled that sum on that day, but that $700 was subscribed by unincorporated benevolent associations; that other subscriptions to the amount of $2000 were made by married women; and that other subscriptions amounting to between one and two thousand dollars were payable in land and other property. The chancellor, after pointing out the particulars, in which the terms of the subscription had not been complied with, says, that the conditions upon which the plaintiff Stewart had subscribed, not having been complied with, he never became liable upon his subscription. I shall have occasion, in another connection, to refer to this opinion more fully.

As establishing the same principle, I refer to the case of *Sandford* v. *Handy*, (25 *Wend.* 475.) In that case proposals were issued to form a joint stock company for the sale of certain lands. The lands were to be divided into 23 shares of $5000 each, and the defendant subscribed for one share. All the shares were not subscribed for. The supreme court were of the opinion that by the true construction of the contract all the shares were to be subscribed for before any subscriber should become liable upon his subscription, and that this was a condition precedent—and the whole number of shares not having been taken, the defendant was not liable. It will be observed that in this case there was no express provision in the subscription paper, that the whole number of shares should be taken; but the court holding that by the true intent and import of the agreement, all the shares were to be taken, such taking was a condition precedent to the defendant's liability.

The plaintiff's counsel has referred to another case upon this same contract, in 2 *Denio*, 235, and confidently relies upon it as an authority to sustain the defendants' liability in this case. The supreme court had held in conformity with their decision in 25 *Wend.* (*supra*,) that the subscription of the whole number of shares, *as clearly implied on the face of the agreement*, constituted a very material part of it, and deeply affected the separate interest of each subscriber, and that the defendant could not be made liable, as this material condition of the contract had not been complied with. The court of errors reversed

the judgment ef the supreme court, upon the ground that it was not a condition of the agreement that the whole twenty-three shares should have been subscribed. The opinions for reversal were delivered by the chancellor and Senator Lott. The former says, at page 251 : " I confess, upon examining the agreement I cannot discover any thing from which it can be reasonably inferred that the subscription of the whole number of shares, or of twenty-one shares, was intended to be made a condition precedent to the rights of the defendant to claim the benefit of the contract, or the rights of the plaintiff to demand a performance on the part of the defendant." Senator Lott says, at page 256 : " It was contended, however, that his [the defendant's] *covenant* was conditional, that his agreement was to take one share, if the twenty-three shares were subscribed and not otherwise, and that the subscription of the whole number of shares was an indispensable condition, and an integral term of the contract itself clearly appearing on its face. It is not pretended that there is an express condition of that nature, and a careful examination of the different provisions of this agreement will show that such is not its fair construction." Senators Porter and Bokee delivered opinions in favor of affirming the decision of the supreme court, on the ground taken by that court, that it was fairly inferrible from the whole contract that it was upon the condition that the whole twenty-three shares were to be subscribed. The judgment of the supreme court was reversed by one majority, and it must be assumed on the ground stated by the two judges who delivered the prevailing opinion, that the covenant was not conditional. Instead of this case being, as was assumed by the plaintiff's counsel on the argument, an authority for the proposition that when an agreement is made upon condition, the party can be bound by it, without showing that the condition precedent has been fulfilled, I regard it as sustaining exactly the contrary doctrine. All the judges who delivered opinions in that case concede that if the covenant had contained an express condition that the twenty-three shares should be subscribed, the defendant could not have been made liable without showing that such subscription had been made, and the only difference be-

tween the court of errors and the supreme court was whether such a covenant could be implied as clearly appearing on its face. The supreme court and the minority of the court of errors holding that such was its fair construction, and the majority of the court of errors, though holding otherwise, conceding that if such was its fair construction the plaintiff could not recover.

This case is disembarrassed from the difficulty arising in that. In the agreement under consideration, is an express stipulation that the same "is not to be binding until the sum of $300,000 is subscribed." If I am correct in the view I have taken of the facts in this case, $300,000 was never subscribed to that subscription, but only about $212,500. It never, therefore, became the defendant's subscription. The condition precedent on which he agreed to become a subscriber, did not arise, and therefore no legal liability attached to him in consequence of that conditional engagement.

But it is contended on the part of the plaintiff, that taking all the three subscriptions together, the same amounts to the sum of $300,000, and therefore the condition has been performed and the defendant's engagement is complete. I have already stated the difficulties in maintaining this position. The first and obvious one is, that such is not the defendant's agreement; when he signed this he saw preceding it two distinct, separate and independent subscriptions, one of the 12th of October, 1855, for $40,000, and the other an engagement by sixteen persons that they would subscribe the sum of $50,000, *provided*, the sum of $300,000 was subscribed under the resolution of November 8, 1855. It is apparent to my mind, that originally these three subscriptions were regarded as separate and independent.

It is sufficient for this case to say that there is nothing in the agreement signed by the defendants to warrant the ground now assumed, that the $40,000, and the $50,000, subscriptions, were to be deemed part of the $300,000 which was to be subscribed before such subscriptions were to be binding. I do not think such was originally the intent of the parties. It will be seen that the terms of both these subscriptions were entirely

different from those of the $300,000 subscription. The $40,000 of October 12th, was to be made in notes at 4 months. The $50,000, in cash or notes, at 30, 60, 90 days or at 4 months, while that of the $300,000 was made in notes at 6 and 12 months, in equal amounts. It is impossible therefore to say that these three subscriptions are to be deemed and taken as one, and as forming a part of the $300,000. Their very language and terms contradict this assumption. Besides, it is apparent to my mind, that the fair construction of this subscription for $300,000 is, that the same is not be operative unless the entire sum of $300,000 should be subscribed thereto, on the same terms as therein expressed, viz: in premium notes at 6 and 12 months in equal amounts. Now, there is no ground for asserting that any such sum has been subscribed on those terms, and the difficulties are to me insurmountable, in taking other subscriptions, made at different times and on different terms, and regarding them as a part of this. This view of this case is so clear and conclusive to my mind, that I should have no hesitation in ordering judgment for the defendants without considering the other questions raised. But, as they have been discussed with care and ability, and pressed with earnestness upon the court, they merit a careful consideration.

The plaintiff contends that as the whole sum of $300,000 was actually subscribed after the date of the 12th of October, this court is to hold, that within the fair meaning and intent of the subscription, signed by the defendants, the sum of $300,000 was subscribed, and therefore the condition was fulfilled. This is on the assumption that the subscription of $40,000 and that of $50,000 (in fulfillment of which $48,000 appears to have been only subscribed) are included as part of the $300,000 subscription. The objections to this have already been stated. It is not alleged that all the subscriptions made after October 12, including that, exceed the sum of $300,000. It is said that the sum total of the whole just equals that sum. In this total is included the $40,000 subscription of October 12. That subscription, as is apparent from the terms of the resolution of October 30, had been placed on a footing different

from the other subscription made under the resolution of the board of November 8, 1855. It, in fact, was to be regarded as confidential, while the residue of the subscription did not partake of that character. It was securing to a portion of the subscribers an advantage not participated in by the others, and I do not regard the fact that the trustees did not carry out this arrangement as varying its legal effect. A not dissimilar arrangement existed as to a portion of the subscriptions for the benefit of Hamilton College, in the case of *Stewart* v. *Trustees of Hamilton College,* (*cited supra.*) There the total of the subscription was to be $50,000. The whole amount not being subscribed by the day named, the trustees passed a resolution to raise further money to save harmless those persons who had agreed, and who thereupon did make up the deficiency, and the trustees therefore regarded the whole amount as subscribed. Chancellor Walworth said, in reference to such an agreement that, " the essence of every agreement of this kind is, that there should be perfect equality among the subscribers as to the nature and extent of their respective liabilities for the several sums subscribed by them respectively. To have made this general subscription valid, so as to fill up the sum of subscriptions and contributions to the amount of $50,000, (the sum in that case to be subscribed before the subscriptions became binding) within the terms of the agreement, it should have been an absolute donation of the amount of the deficiency, to be paid at the same time as the other subscriptions, and no part of it to be restored or refunded to them upon any contingency, or in any event other than such as were common to the subscription of all the other subscribers." In support of this well settled principle, alike in harmony with the law and sound morals, the Chancellor refers to the case of a composition deed, where there is an express agreement between the creditors themselves to discharge the debtor upon receiving a ratable proportion of the respective debts, any private agreement or understanding between the debtor and any particular creditor that the latter shall at any time, or in any contingency receive a greater sum than the amount of his debts specified in the composition deed,

Berry *v.* Yates.

is held to be void, as a fraud upon the other creditors. (1 *Anst. Rep.* 202. 3 *id.* 910. *Jackson* v. *Duchaire,* 3 *T. R.* 551. *Cockshot* v. *Bennett,* 2 *id.* 763. *Steineman* v. *Magnus,* 11 *East,* 390. *Weed* v. *Bentley,* 6 *Hill,* 56.) The agreement, therefore, to regard this $40,000 subscription upon a different footing, than the residue of the subscription was a fraud upon the other subscribers, and vitiated the whole transaction.

But it is argued that the defendants must have known that this $40,000 subscription was to be taken as part of the $300,000 subscription, and the terms and conditions upon which it had been made. *First.* Because the trustees, in their resolution of November 8, 1855, authorizing this subscription, stated that it should be binding when $300,000 was subscribed, including the $40,000 already subscribed. *Second.* That the reference to that resolution, in the subscription signed by the defendants, adopts it as part of the terms of the subscription. In relation to the first position, nothing was said in the resolution of November 8, of the terms upon which the $40,000 had been subscribed, and although the trustees might have intended that the subscription should be binding on all the subscribers, when $260,000 additional was subscribed, such clearly is not the language or true construction of the subscription. That is the agreement of the defendants, and by that must they be bound; any intention of the trustees not communicated to them, and assented to by them, can have no significance in determining their liability; and it seems to me that the reference the subscription to the resolution of the trustees was not of such a character as to lead the defendants and the other subscribers to suppose that it contained any thing else than the general authority to raise a subscription to the amount of $400,000. It certainly cannot be fairly said that this reference adopts the provisions of that resolution, that the subscription was to be binding when $260,000 was subscribed, when the subscription itself contains a contrary stipulation. The latter must govern as being the contract of the defendants.

Conceding that the defendants had agreed to be bound, pro-

vided $260,000 in addition had been subscribed, was that condition complied with? Including the $48,000 subscribed, as I regard it in fulfillment of the engagement of November 8, to subscribe $50,000 the total of all, excluding the $40,000, is just equal to the requisite sum of $260,000. To make up this sum there is included subscriptions to the amount of $37,000 by various insurance companies. I am at a loss where to find the power or authority conferred upon these companies to advance their notes in anticipation of premiums on insurance which they may never make, and in this case never did make except to a small extent, to sustain a failing or revive an insolvent corporation. If these subscriptions, or any part of them, were ultra *vires,* they are void and no subscriptions, and it follows that the necessary amount to make the defendants' subscription binding, never was raised. No power is shown in their charters thus to apply the funds of this corporation to such purposes, and it is certainly not an incidental power and necessary to the conduct and management of the business for which they were called into being. It certainly needs no argument or authority to show that a corporation created for the purpose of insurance has no power to advance its moneys, or obligations, to sustain another corporation in similar or dissimilar business. Neither does the authority given to these companies to reinsure policies or risks taken by them in other companies, authorize or give any warrant for these subscriptions. When these premium notes are given, the maker becomes to that extent a stockholder in the company receiving the premium notes, and by numerous decisions in this state, the whole amount of the note is payable, though no insurance has ever been effected by the maker, and such notes are a substitute for capital stock. (1 *Sand. S. C. R.* 158, *and cases there cited.*)

Could these companies thus subscribe to the capital stock of the Atlas Insurance Company? This point was ruled in the negative by the supreme court of Connecticut. (*Mutual Savings Bank* v. *Meriden Agency Company*, 24 *Conn. Rep.* 159.) The chief justice in delivering the opinion of the court in that case says: "But when the directors of the company subscribed

for stock in a building association, whatever may have been their motive, whether to obtain a loan of money, or for purposes of speculation, they transcended the powers conferred upon them, and departed from the legitimate business of the company, as much so as if they had subscribed for stock in a manufacturing or steam boat company. Such subscription, in our opinion, is not binding upon the defendants, and any payments made upon it to the plaintiffs would be money received by them without consideration." The court held in that case that the subscription was void and that the corporation never became stockholders. If these corporations had the power to make their subscriptions, we have seen that the legal effect of such subscriptions was to make the subscriber a stockholder to the amount thereof, and liable to pay such subscription or premium note forthwith, though the corporation receiving it might have failed the next day and never earned in premiums one cent of the amount. Can it be contended that insurance companies organized for a specific purpose, can thus put at hazard, nay waste entirely, the capital stock or fund contributed and held by them, for the purposes of their charter? I think, clearly not, and that subscriptions by them like these now under consideration, are ultra *vires* and void. Such I understand is the current of authority not only in this country, but in England. The case of *Tallmage* v. *Pell*, (3 *Seld.* 328,) contains the rule of this state governing corporations, and that case meets the argument of the plaintiff's counsel, that because these companies were authorized to reinsure their policies or invest their surplus funds in the stocks of other incorporations, therefore they had authority to make this subscription. Neither of these objects were those for which these subscriptions were made, and though they had authority to do these things, it does not follow that they had authority to lend their means or credit to sustain a failing or insolvent corporation or become stockholders in other corporations.

I shall content myself with citing a single case from the English reports for the rule on this subject as established there. The case of the *East Anglian Railway Company* v. *Eastern*

*Counties Railway Company,* (7 *Law and Eq. Rep.* 505,) is a leading one on this subject, and I am not aware that its authority has ever been questioned or overruled. The case appears to have been very fully and ably argued by the counsel, and maturely considered by the court, and the points decided are; that a railway company incorporated by act of parliament is bound to apply all the funds of the company for the purposes directed and provided for by the act, and for no other purpose whatsoever. And when such a railway company was incorporated by a public act of parliament "for the purpose of making and maintaining" a particular railway and other works by the act authorized, "and for other purposes therein declared," and they were empowered by the act to raise money for making and maintaining the railway and other works authorized by the act, and the money so raised was directed to be expended towards those purposes and otherwise carrying the act into execution, and after paying these expenses the profits of the company were to be divided among the proprietors, the purposes mentioned in the act were confined to the acts to be done upon and relating to the railway to be made by the company. The defendants, the company so incorporated, covenanted with the plaintiffs, another railway company, to take a lease of their railways and to pay the costs of soliciting bills then pending in parliament, by which the plaintiffs were to be authorized to make extensions and branches of their railways. In an action for breach of covenant in not paying the costs of the bills in parliament, held, that the act incorporating the defendants being a public act, must be presumed to be known to the plaintiffs, and that they could not recover, inasmuch as the covenant entered into by the defendants was beyond the scope of their authority as a corporation, and was therefore illegal and void, however beneficial to the defendants' railway, the objects of the covenant, if carried out, might be. Lewis, Ch. J., says: "It is clear that the defendants have a limited authority only, and are a corporation only for the purpose of making and maintaining the railway sanctioned by the act, and that their funds can only be applied for the purpose directed and provided for by the statute. * * * Any proprietor when he takes shares has

Berry *v.* Yates.

a right to expect that the conditions upon which the act was obtained will be performed, and it is no sufficient answer to a stockholder expecting his dividend, that the money has been expended upon an undertaking which at some remote period may be highly beneficial to the line. The public has an interest in the proper administration of the powers conferred by the act."

Applying these principles to the present case, it is quite clear that no power was given to the officers of these various companies to make this subscription, and thus if they had the power, subject the property of their stockholders to the hazards of a business carried on by another corporation, in whose management they had no voice or control, or to appropriate the funds and property of their shareholders to the payment of losses sustained by another corporation, or to the discharge of debts incurred by it. No such departure from the powers conferred on these companies, or from the duties imposed upon them, can be sanctioned by this court. Such acts are unauthorized and void, and although these companies did subscribe to this fund the sum of $37,000, it was in fact no subscription, and the necessary amount to make it binding by its terms on the defendants, supposing all the residue properly made up, remained deficient to this amount.

But it was contended on the argument, that supposing this objection tenable, it appeared by the testimony that the Atlas Insurance Company had realized the proceeds of all their subscriptions of those companies, except that of the International and Philadelphia Insurance Company, amounting to $7000, and $2500 of that of the Astor Mutual Insurance Company. It appears that the notes received from these companies, thus realized, were passed away by the Atlas Mutual Insurance Company, and if the doctrine of the supreme court of Connecticut is sound, any payment made by these companies, being upon a void subscription and without consideration, may be recovered back. It is, therefore, far from safe to say, that the Atlas Insurance Company has received the avails of these subscriptions. It is quite beyond contradiction, that of these subscriptions, $9500 are still unpaid by these companies, and if the law is as an-

nounced in this opinion that sum cannot be collected. These companies had no authority to make any such contract; it is simply void, and is no subscription within the meaning and intent of the stipulation that $300,000 was to be subscribed before the subscription was to be binding.

But assuming that I am in error, in reference to the binding force and validity of the subscription of these companies, there is an objection to that of one of them, which is fatal to it, and sufficient to reduce the subscription below the $300,000. I allude to that of the International Insurance Company. That was never authorized by the directors of that company or known to them. It was proven on the trial of this case that it was made under an agreement between the two companies for a mutual exchange of notes for the sum of $5000. That these companies had no authority to make such exchange, needs no argument to fortify and illustrate. That such an arrangement was a fraud upon the other subscribers, we have seen to be established, and consequently it vitiated the whole transaction. In the language of Chancellor Walworth, already cited, the essence of such an agreement is that there should be perfect equality among all the subscribers as to the nature and extent of their respective liabilities. No such equality is preserved by such an arrangement, but is equally, if not more, vicious and objectionable, than the arrangement in reference to making the $40,000 subscription confidential. It was proven that several of the individual subscriptions were made upon terms and arrangements, not common to other subscribers, being taken, on account of debts past due by the company to the persons making the subscription, the condition being if he would subscribe, it should apply in part payment of the debt due and the balance would be paid by the company. This arrangement was equally a fraud upon the other subscribers, and vitiated the transaction.

I am, therefore, constrained to hold, in every aspect in which I have regarded this case, that the condition precedent, which the parties agreed to and reduced to writing, and which was made part of the agreement upon which these defendants are now sued, viz : That the same was "not to be binding until the

sum of $300,000 is subscribed," has not been fulfilled, and that consequently no legal liability has been created against the defendants by signing the same.

[NEW YORK SPECIAL TERM, April 24, 1857.  *Davies,* Justice.]