The opinion of Mr. Justice Boswobth, at Special Term, disposed of most of the questions raised on the trial, and is, therefore, inserted:
Bosworth, J.
This action is brought upon one of two notes given by the defendants for the amount of their subscription to the Atlas Insurance Company, upon the subscription of the 8th of November, 1855, called herein the $300,000 subscription.
The defendants insist that the subscription, by its terms, was not to be binding until the sum of $300,000 was subscribed, and also that such sum was not subscribed, and, therefore, the note *158 would not be obligatory in the hands of the Company, and also insist that the equities of the plaintiff are not superior to those of the Company.
Conceding that the sum of $300,000 was not subscribed, in subscriptions valid at law, it does not follow that, because no action could have been maintained upon the subscription itself, and the contract it created, that none can be upon notes given by the subscribers to the Company for the amount of such subscriptions. The notes were given in advance of premiums upon insurance which the defendants intended to effect with the Company. They might lawfully give notes for such a purpose, and the Company might lawfully receive them. If they have been given voluntarily for such a purpose, and no fraud has been practised to obtain a delivery of them, they may be enforced by action, although the defendants could not have been compelled to give them, and although no action would have lain against them for refusing to give them.
Stewart v. Trustees of Hamilton College, (2 Denio, 403,) was an action brought upon the subscription itself, as the contract between the parties.. Sandford v. Handy, (25 Wend., 475,) and Sandford v. Halsey, (2 Denio, 235,) were actions upon the original instrument or contract between the plaintiff and the defendants as subscribers thereto.
Berry v. Yates, (24 Barb., 199,) was an action upon the subscription as a contract, to recover the amount due upon it, as damages for a breach of the contract by reason of a refusal to give a note or pay the subscription.
But the defendants, instead of refusing to give, have given their notes, and the Company has negotiated the one in suit and received into its treasury more than the amount of the. note advanced on the security of this and other notes; and the question is, can this note be collected by the person so advancing on the security of it and of other notes ?
Three hundred thousand dollars was in form subscribed. But various grounds are stated why some of the subscriptions should be regarded as nullities; and why, therefore, it should be held that $300,000 has not been, in fact or in law, subscribed.
The subscription of $40,000, taken under a subscription paper dated October 12, 1855, was counted as part of the $300,000.1 *159 The defendants insist that, to make subscriptions to the latter obligatory, it was essential that $300,000 should be subscribed, exclusive of the $40,000.
The $300,000 subscription, by its terms, declares that this “ subscription is towards the $400,000 subscription authorized by a resolution of the Board of Trustees of this date, and is not to be binding until the sum of $300,000 is subscribed.” The “ resolution” of that date reads thus: “ On motion, it was resolved that a subscription in the sum of $400,000, in premium notes, to be written against, be obtained; subscriptions to be binding when $300,000 is subscribed, including the $40,000 already subscribed.”
Each of the several subscription books, used to obtain subscribers, had in it, and preceding the $300,000 subscription, a copy of the $40,000 subscription.
There is no proof that any one who subscribed to the $300,000 subscription was deceived or misled by anything said or done by any agent of the Company as to the terms of the resolution authorizing that subscription. There is no ground upon the evidence to impute to any officer of the Company any intent to deceive any such subscriber in that respect.
The mere fact, therefore, that the $40,000 subscription was counted, in order to ascertain if the $300,000 had been subscribed, is no defense to an action upon the note in suit.
It is also satisfactorily proved there was an original paper called the $50,000 subscription paper, a copy whereof was written on the first page of the several subscription books used in procuring the $300,000 of subscriptions.
The fact that several whose names were signed to that paper, or that all of them, subscribed to the $300,000 subscription, does not invalidate the latter, or affect the liability of any of the subscribers to the latter, notwithstanding no notes were, before the failure of the Company, given under the $50,000 subscription itself. As to the persons who subscribed to both the $50,000 and the $300,000 subscriptions, it may be truly said that, in computing to ascertain if the $300,000 had been subscribed, their subscriptions to the latter were alone counted, and those made to the $50,000 subscription were not counted.
If the purpose which they testify they had in view in signing the original paper called the $50,000. subscription cannot be shown *160 to exonerate them from liability upon it, on its being made to appear that they subscribed the like amount, or more, to the $300,000 subscription, it by no means follows that the subscriptions to the latter are not obligatory. The $50,000 subscription itself was not counted as a part of the $300,000.
I do not perceive any irreconcilable conflict between the terms of the paper called the $50,000 subscription and an agreement among themselves, intended to be thereby expressed, and to be thereby notified to those who might be solicited to subscribe to the subscription for $300,000, to the effect that they would subscribe to the latter the sum of $50,000 on the same conditions and terms in all respects as the other subscribers, with the single difference that for the $50,000 so to be subscribed by them, notes should be given at thirty, sixty and ninety days, or four months, instead of notes at six and twelve months.
That paper does not state the proportions in which they were severally to subscribe or had subscribed in subscribing the $50,-000. It declares they subscribe “ on the same condition set forth in,the resolution” of the 8th of November. And while it-declares that, it also declares that the subscriptions were to be paid “in cash or notes at thirty, sixty, ninety days, or four months.” Such short notes would be beneficial to the Company, and no prejudice to other■ subscribers. By the “same conditions” must therefore have be^n meant, that the notes for the amount subscribed were to be given “in advance of premiums of insurance,” and that on the amount of such notes at their maturity, the subscribers were to be allowed by the Company five per cent. There has been no attempt on the part of those persons to appropriate any assets of the Company to secure them for the short notes they gave as subscribers to the $300,000 subscription. I do not think the transaction furnishes evidence of an intent to defraud persons who should subscribe to the $300,-000 subscription, by giving an assurance not intended to be kept as the parties themselves understood it, and supposed all others would understand it, which of itself will make the note in suit void in the plaintiff’s hands. Whether, therefore, they can be permitted to show that they signed the $50,000 subscription for the purpose and on the understanding to which some of them have testified, in' order to escape from liability as such subscri *161 bers, is a question, which I do not deem it necessary to attempt to determine. I think they acted in good faith at the time, and without any intent to thereby mislead or defraud.
There is no satisfactory evidence that either before or at the time the paper for $50,000 was signed it was agreed between the signers of it and the Company that any subscription for $300,000 should be accepted in lieu of, or in satisfaction of, their liability as subscribers to the $50,000 subscription. Nor that the short notes given for the subscription to the $300,000 subscription were accepted by the Company in satisfaction of, or as a perform-' anee of, the contract created by the $50,000 subscription.
If there are no other grounds of defense than the two, viz., that the $40,000 was counted in making up $300,000 of subscriptions, and that those signing the paper called the $50,000 subscription did not intend to make and did not suppose they had made themselves liable for the latter amount, in addition to their subscriptions to the $300,000 subscription itself, the plaintiff is entitled to recover. If the terms of the $50,000 subscription are such as to preclude those signing from alleging and showing the understanding had between themselves, nothing has since occurred to exempt them from any liability they incurred by signing it, and using it as it was used.
The defendants are sued upon a note which they have made and delivered. The burden of proving facts constituting a defense rests upon them.
I do not think they have established the fact that they were induced by any fraud, practised or intended to be practised on them, to give the notes.
Including the $37,000 subscribed by Insurance Companies, I have no doubt that the Trustees believed $300,000 had been subscribed when the resolution was passed which stated that, “It being understood that $300,000 is now subscribed under the resolution of the Board of November 8th, it is therefore resolved that the officers commence at once to collect notes to that amount and proceed in liquidation of the liabilities of the Company therewith.”
Any subscriber being shown a copy of this resolution, or told its contents, and'asked for his notes, could not say that any fraud had been practised upon him, if the result should demonstrate *162 a small error in computation, or an error in treating a copy of one or two subscriptions as an original. The fact may turn out to be contrary to his belief; but in such a case there would be no misrepresentations to deceive, nor any intent to defraud him; and a subscriber asked to give notes under such circumstances would be notified of the purpose of the Company to use them immediately in liquidating its liabilities. Using them for such a purpose would not be a misappropriation of them as between himself and the Company, nor would such a use of them be a fraud or surprise upon him.
Does the use made of them create a bar to the right of those to whom they were negotiated, to sue upon and collect them ?
The Company, to put itself in the possession of money, must procure the notes to be discounted or borrow on the security of them. If solvent, I see no difficulty in the Company’s procuring money in either mode. Either form would be a valid transaction. Certain gentlemen, of such credit that their notes at short dates would be discounted, advanced such notes on the security of the note in suit and other notes. The notes so advanced, the Company converted into money, and used the money in paying the just debts of the Company. The notes so advanced were paid. Why should not those advancing and paying their notes, collect from the securities on which they advanced, enough to reimburse the sums so.advanced?
I can see no answer to their right to do so, in any of the facts of the case thus far considered, unless the fact that the persons so advancing were Trustees of the Company, is of itself a good answer. I cannot think that if such an advance, when made by third persons, would be legal, and the transaction upheld, that Trustees so advancing lose all right to enforce such a note as the one in suit, merely because they were Trustees when they advanced or loaned to the Company on the security of some of its premium notes.
Nor do I think that the defendants can escape liability upon the idea that the Company was, or was supposed by its Trustees to be, insolvent either on the 8th of November, 1855, or when the note in suit was transferred, with others, to secure advances made on their credit, in any such sense that such a transfer was prohibited and made void by statute.
*163 On the 8th of November, 1855, the assets of the
Company amounted to..................... $701,238 60
Its liabilities, including the estimate of losses, on claims then presented, were................. 573,458 76
Surplus,................................ $127,779 84
It continued its business as usual, for some months thereafter.
But a small amount, not over $20,000, (as I remember the testimony,) of these assets were either supposed to be or proved to be bad. The Company had, it is true, a large amount of pending risks. These proved to be unfortunate ones; so much so that they, in a few months, produced claims for losses which forced the Company into the hands of a Receiver.
I have no doubt the Trustees of the Company believed the Company would continue its business at the time subscriptions to the $300,000 were being made, and when it was resolved to collect the subscription notes; and might in good faith honestly so believe in coming to a conclusion upon that point, upon such considerations as influence men in business of that character.
That the Company needed present means to pay liabilities on the 8th of November, 1855, although its assets exceeded in value the amount of its known or estimated liabilities by more than $100,000, is undoubtedly true. Every subscriber presumptively knew that the object of the subscription was to increase the resources of the Company, and furnish means to enable it to pay, the more easily and readily, its liabilities.
But there is nothing in that fact, or in the actual condition of the Company when viewed as its Trustees regarded and might honestly regard it, which makes this note void in the hands of Nelson & Stages, whether the circumstances and purposes under and for which it was made and delivered, or those under and for which it was transferred to Nelson & Stages, are considered.
There is nothing in the fact that all who signed the $300,000 subscription have not given their notes, which can exonerate the defendants from liability. All the individuals and firms who signed it, did so, at the time, in good faith. It is true, that the Company having become embarrassed before all of the subscribers were required to give their notes, some of them being *164 creditors refused to give notes, taking their chances of effecting an off-set of their demands. But if such a subscription, signed, is as effective in law to create a liability as notes given to the Company for the purposes specified in the subscription itself, it is difficult to perceive on what ground the subscribers can escape from liability, except the single one that $300,000 was not in fact subscribed.
In the present case, as already stated, my opinion is, that the defendants, upon the evidence given in this action, do not stand upon as favorable a footing as if sued on the subscription itself, for refusing to give notes. They have given these notes, and this suit is upon one of them. No fraud was practised upon them, either by any misrepresentation made, or the fraudulent concealment of any material fact, to induce them to give the note.
If such a subscription would not of itself create a liability on which an action will lie, either because it is not authorized by the charter, or for any other reason, then a subscriber who has not given a note may be in a better condition than one who has.
Whether the Insurance Companies who subscribed, and gave their notes, had power to make subscriptions valid in law, it is unnecessary for me to determine. It was undoubtedly supposed they had the power. The defendants knew, when they subscribed, that subscriptions had been made by such companies, and must have supposed that such subscriptions'were to be counted as part of the $300,000. If it turns out that those companies could not be made to pay, such a mistake would not avoid these notes in the hands of persons who had advanced money to the Atlas Insurance Company on the credit and security of the notes themselves.
Of the Insurance Companies which subscribed, all but two gave notes, and notes amounting to $30,000.'
As the evidence stands, the Philadelphia and International Insurance Companies made subscriptions which could not have been enforced, conceding that, if made by competent authority, they would be obligatory. It seems that the different companies insured, or reinsured, in some instances with each other; and I do not find any fraud, or intent to defraud, in taking these subscriptions, or counting them as a part of the $300,000.
*165 Without stopping to inquire what force would be due to such a fact, in an action against a subscriber for refusing to give his note, yet, as in this case notes have been given without any fraud having been practised in procuring them, I think Nelson & Sturges, and the plaintiff as succeeding to their rights, has equities superior to those of the defendants.
If the subscription of A. C. & L. R. Chesbrough was counted at $13,000 or $13,500 to make up the $300,000, it was counted at no more than it was made.
If altered since, it was done, as the evidence stands, without authority; and their liability is the same as if the subscription now remained as originally written; what effect the substitution and acceptance of other responsible subscribers for a part or the whole of the amount of the reduction may have upon the liability of the Messrs. Chesbrough, it is unnecessary to attempt to determine now.
If all the subscribers whose subscriptions were counted as part of the $300,000 (excepting the Insurance Companies) had given their notes under the same circumstances that the present defendants gave theirs, and a part of them had passed into the hands of the Eeceiver, and if payment of them was necessary in order to provide means to pay the just creditors of the Company, I think the Eeceiver could have collected them. (1 Comst. R., 371; 4 id., 51.)
Nelson & Sturges did not take the note in suit to secure themselves, or other trustees, for preexisting debts or liabilities, but for money advanced at the time, and on the security thereof, to be used, and in fact used, legitimately in prosecuting the ordinary business of the Company.
In brief, the case is this: It was supposed that $300,000 of subscriptions had been made. Believing this, the defendants gave their notes. No fraud was intended or practised to induce them to give the notes. Except in so far as the notes find their consideration in the fact that others also gave their notes for the same general purposes, and the giving of notes by one induced the giving of notes by others; and in-the statute which authorized them, and makes them obligatory when the statute has been complied with, the defendants trusted to the Insurance Company to furnish or pay the consideration of the notes, by insuring *166 until the premiums amounted to the face of the notes. But those whom the plaintiff represents advanced their money on the credit and security of the notes themselves, and not on the credit or responsibility of the Company. At best, there has been a common and mutual mistake of facts. To rescind, all parties who have parted with money or property in good faith must be put in statu quo. The plaintiff cannot be compelled to give up the note in suit, or prevented from collecting this note, until the amount advanced on the credit of it, and of other notes, has been refunded.
Gilbert Dean, for defendants, (appellants.)
I. The Atlas Insurance Company was a “ moneyed corporation.” (1 R. S., 598, 599, §§51, 52, 53; 5 Seld., 589; Charter of Company, 17 N. Y. R., 554.)
H. The transaction which is held to be valid by the finding in this case, comes directly within the prohibition of section 7 of the Revised Statutes, to prevent the insolvency of moneyed corporations. (1 R. S., 591.)
I. This was a transfer of $40,000 of “ effects ” to be used “for the benefit of the Company.”
2. The transfer was not made “ to the Company directly or by name,” but to “ ¡Nelson & Sturges, special trustees for all parties concerned.”
3. The powers given, to these “ special trustees,” to take an unlimited amount of the assets of this corporation as security, and to dispose of the same without notice, shows the wisdom of the legislative prohibition.
4. The object of section 7, says Judge Seeded, was “ to prevent the property of the corporation from being placed beyond the control of its Board of Directors.” (17 N. Y. R., 554.)
“ It was intended as much for the benefit of stoclcholders as of creditors.”
My conclusion, therefore, is, that the plaintiff is entitled to recover the amount of the note and interest, which at this date is $1,388.78.
From the judgment entered in favor of the plaintiff, in conformity with the decision, the defendants appealed.
*167 in. The corporate powers of this Company could only be exercised by the Board of Trustees, not less than eleven constituting a quorum. The Board could not delegate their powers to two of their number, and authorize them to take its assets without limit and to make of them any disposition they chose. (1 Sug. on Pow., 340, 341; Cole v. Wade, 16 Vesey, 27; 3 Comst., 396; 2 Seld., 92.)
1. This corporation was created for the purpose of effecting insurance, and could, by the 12th section, receive “ notes in advance of persons intending to receive its policies.” It had no power to borrow notes. (2 Kern., 569.)
2. The rate of compensation which it could allow for notes so received in advance, was fixed—“ five per cent." The resolution in this case not only authorized the officers to give any security, but to make any allowance for the use of the names of parties. ■
3. A statute corporation, created for a particular purpose, has such powers, and such only, as are conferred upon it by the statute, and is confined strictly to those powers.
The statute is an enabling act, and enables it to do everything it may lawfully do. (Head v. The Providence Ins. Co., 2 Cranch, 167-169; 2 Kent, 290-299, 5th ed.; The Queen v. The East. Co. R. W. Co., 10 Ad. & El., 531.)
4. The principle is also affirmed by the Revised Statutes, which declare that in addition to the powers enumerated in the 1st section of the title, and to those expressly given in its charter, or in the act under which it is or shall be incorporated, no corporation shall possess or exercise any corporate powers, except such as shall be necessary to the exercise of the powers so enumerated and given. (1 R. S., 600, §3.)
5. The officers of a corporation are not the corporation; they are only its agents, and cannot bind their principal by an act which is either unauthorized by the charter or forbidden by law. (U. S. Bank v. Dandridge, 12 Wheat. R., 64; Salem Bank v. Gloucester Bank, 17 Mass. R., 1, 28, 29.)
6. The powers of a corporation are not only in writing, but they are matter of law; and there is no color for saying that the officers can bind the principal when acting beyond the scope of the corporate powers. Persons dealing with such officers must see to it that the act is authorized by the charter. (Mechanics’ *168 Bank v. N. Y. & N. H. R. R. Co., 3 Kern., 599; Hood v. N. Y. & N. H. R. R. Co., 22 Conn. R., 502, 508-572; Wyman v. Hal. and Aug. Banks, 14 Mass. R., 58, 63; Salem Bank v. Gloucester Bank, 17 id., 1, 28, 29.)
IV. The power given to Nelson & Sturges to take an unlimited amount of the assets of this Company, and to sell them at their option, is a direct violation or repeal of section 8 of the act before referred to.
V. The defendants, being interested as creditors and stockholders, may take advantage of a statute “to secure their rights.”
VI. A corporation, or its stockholders or receivers, may in every case impeach any contract made by directors or other officers or agents, in the name and professedly by such corporation. (2 Denio, 110; 5 id., 567; 3 Barn. & Ald., 1.)
But the defendant, without reference to his connection with the Company, may defend for want of title in plaintiffs. (Johnson v. Bush, 3 Barb. Ch. R., 207.)
W. Britton, for plaintiff, (respondent.) .
I. TJiere was no illegality in the transfer, for the transaction under which the note was transferred to Nelson & Sturges was valid.
1. It was but a loan by the parties thereto, for whom Nelson & Sturges acted, to the Company, and taking collateral security thereto, which is clearly legal. (Charter Atlas Co., § 12, “Atlantic; ” Barker v. Mechanic Ins. Co., 3 Wend., 96; Munn v. Commission Co., 15 Johns., 44; Attorney-Gen. v. Life Ins. Co., 9 Paige, 470; Moss v. Oakley, 2 Hill, 265; Barry v. March. Ex. Co., 1 Sandf. Ch., 280; Beers v. Phoenix Glass Co., 14 Barb., 358; Curtis v. Leavitt, 15 N. Y. R., 62-65; King v. Merch. Ex. Co., 1 Seld., 547; Furniss v. Gilchrist, 1 Sandf., 53.)
2. If a trust by the Company, it was competent for the Company to make such a trust. (Angell & Ames on Corp., § 241; Curtis v. Leavitt, 15 N. Y. R., 62-65; De Ruyter v. St. Peter's Church, 3 Cormst., 238; Nelson & Sturges v. Eaton, 15 How. Pr. R., 305; Barry v. Merch. Ex. Co., 1 Sandf., 280; Leavitt v. Blatchford, 17 N. Y. R., 534, et seq.)
3. If not valid in toto, there is no invalidity in any portion under which plaintiff claims. The maxim, “ void in part *169 void in tota,” is not, in general, law, and this is not an exceptional case. (Curtis v. Leavitt, 15 N. Y. R., 96, 97.)
4. Hor can it be objected that the agreement was void for noncompliance, on the part of the Company, with part 1, title 2, chap. 18, art. 1, sec. 8 of the Eevised Statutes; for,
(u.) That section is in conflict with the 12th section of the charter of the Atlantic Company, made a part of the charter of the Atlas, and the charter having been last enacted, the Eevised Statutes must yield. (Howland v. Meyer, 3 Comst., 293.)
(5.) But if that section of the Revised Statutes does apply, the resolution passed January 14th (appearing in minutes of 29th) authorized the transaction.
(c.) If not authorized by the resolution, it is only invalid as against the Company, its Eeceiver, or judgment creditors; defendants are not in a position to set it up. (Nelson v. Eaton, 15 How. Pr. R., 305; Tracy v. Talmage, 4 Kern., 162; Curtis v. Leavitt, 15 N. Y. R., 240, 106, 107; City Bank of Columbus v. Bruce, 17 N. Y. R., 515.)
{d.) Moreover, the Company, by accepting the benefit of the transfer, ratified the act, which ratification, in its legal effect, is equivalent to previous authority. (Curtis v. Leavitt, 15 N. Y., 48-50; Reuter v. Electric Tel. Co., 88 Eng. C. L. R., 341; Palmer v. Yates, 3 Sandf., 138.)
By the Court.—Woodruff, J.
The full discussion of the various questions arising on the trial of this case found in the opinion of Mr. Justice Bosworth at Special Term, has narrowed the controversy between the parties to a very few points. For the most part, that opinion appears to have been satisfactory, and no point or argument is made on the appeal addressed to the principal matters discussed there.
It has not, therefore, been claimed here that the note upon which this action is brought, was not a good and valid note in the hands of the Atlas Insurance Company, to whom it was delivered by the defendants, or that it would not be valid and collectible if it were now in the hands of the Eeceiver of that Company ; nor that there was any proof that it was obtained by fraud or misrepresentation; nor that the defendants are relieved from the obligation which its terms import, by reason of any *170 proof that the condition of their agreement or subscription was not satisfied.
These points, and others which were discussed at Special Term, not having been raised on the appeal, and the opinion there pronounced not having in those particulars been assailed, we shall assume that the note is a valid binding note obtained without fraud or misrepresentation, given upon a sufficient consideration, and collectible by the Atlas Insurance Company, or its Receiver; and we shall also bear in mind that the note was received by the Company for premiums in advance from the defendants, who intended to receive its policies.
If the views expressed at Special Term had not been thus acquiesced in, our reflection upon the points involved would lead us to say that they have our entire concurrence.
The question therefore discussed on the appeal, and the only question, was, whether the plaintiff has such a title to the note that he can maintain the action thereon and recover from the defendants ?
There is no formal defect in the title. The defendants made the note payable to their own order, and indorsed it in blank; it thereupon became transferable by delivery, and the possession of the note, and its production by the plaintiff, makes his formal title complete. But in fact the defendants delivered the note to the Atlas Insurance Company; that Company delivered the note to Nelson & Stages under the agreement found by the Court, and to be presently considered, and the plaintiff received the note from Nelson & Stages after its maturity, and knowing at the time the circumstances under which they received it. He is therefore in no better situation than Nelson & Stages would be had they brought the action. It is therefore their title that is assailed.
The transfer to Nelson & Stages is claimed to be illegal and void. It is necessary for the defendants to go to that length, for if that transfer is not void, but voidable only by the Company or its Receiver, then the plaintiff is entitled to recover, because neither the Company nor the Receiver having avoided the transfer or claimed that it was not in all respects fair, proper and equitable, and having made no claim upon the defendants, the latter are protected in paying it to the plaintiff as holder.
*171 But the transfer by the Company is alleged to be void, upon these grounds: That the Company was insolvent at the time of the transfer, and therefore any transfer of its assets was unlawful ; that not only on this ground, but also because it violated the statute, the trust upon which the transfer was made to Nelson & Sturges was illegal and void, and also because the Company had no power to borrow notes ; and that the transfer to Nelson & Sturges, embracing in amount more than $1,000 of notes, was not sufficiently authorized by the Board of Directors, and was therefore void. These points are founded, or claimed to be founded, upon the provisions of sections 7, 8 and 9, of article 1st, of title 2d, of the 18th chapter, of part 1 of the Revised Statutes. (1 R. S., 591.)
In relation to the first point, it must suffice to say that the finding of facts does not support it, and the evidence supports the finding. Section 9 of the statute forbids any assignment or transfer when insolvent or in contemplation of insolvency, with the intent of giving a preference to any particular creditor over other creditors of the Company. In the first place, the Company had settled its losses up to the 1st of January, 1856, and down to the 15th of January had no knowledge of any losses which rendered the continued solvency of the Company doubtful, but on the contrary, its trustees and officers believed it entirely solvent; they could not, therefore, have made the transfer with intent to give a preference. In the next place, the liability to be called upon in the future for losses which may exceed the capital or assets of an Insurance Company, is not insolvency within the meaning of that statute. If it was, then it would never be proper for an Insurance Company to take risks exceeding the amount of its capital, since with those risks outstanding there is a liability to insolvency at any moment. The business of insurance, from its very nature, requires for its success the capacity to take risks to an amount greatly exceeding its capital, and it can never be deemed insolvent in the sense that its payments and transfers, in due course of business, can be said to be with intent to give a preference to one creditor over another, until its officers or agents are notified of losses which they are unable to pay. Again, the transfer in question was not within the statute; it was not in any sense a transfer to give a preference to a creditor; it was merely *172 giving security for an equivalent sum or amount then received. It was not a diminution of assets, but a raising of money and a cotempóraneous parting with securities, not' to pay or secure a debt, but simply to provide for the return of the sum borrowed. Negotiation of bills receivable, and obtaining money thereon for the proper uses and purposes of the Company, is not of itself, and without collusion or fraudulent intent, a transfer of property to give preference to a creditor. And, once more, the transaction was to assist in sustaining the Company in carrying on its ordinary business and paying its losses, and with the expectation that its business would be continued, and not for the purpose of preferring any one or in any anticipation that all would not be paid. Such a transfer is lawful. See observations on this subject in Hoyt v. Sheldon, (3 Bosw., 803-306,) and the cases cited.
It is next claimed that the agreement, in pursuance of which the note was delivered to Nelson & Sturges, was void, and the transfer therefore void, because a trust was created by the agreement, which was void under section 7 of the act above referred to, which declares that “ no conveyance or transfer of any effects for the use, benefit or security of any such ” (moneyed) “ corporation, shall be valid in law, unless it be made to the corporation directly and by name.”
We understand the counsel for the appellant, in his argument upon this point, to insist that the advance agreed to be made by Nelson, Sturges, Massey, Smith and others, who signed the agreement of January 15th, 1856, and the delivery of their notes to Nelson & Sturges, to the amount of $40,000, was such a transfer as is forbidden by the statute.
The answer to this suggestion is twofold. If by any latitude of construction an agreement to advance notes to a corporation, and to indorse notes for its benefit, the notes to be used for the benefit of the Company, could be deemed a transfer of effects within the statute, and therefore invalid, the consequence would simply be that the agreement could not be enforced. Neither party could compel its performance. But if the notes are advanced and they are converted into money, and that money is paid to the corporation and used by it in its proper and ordinary business, the securities given for its repayment cannot be reclaimed without refunding the money.
*173 The transaction was not in any sense within this statute. There was no transfer of effects to any other than to the Company. The subscribers to that agreement lent to the Company, not effects, but their promises to pay ; and when lent,, they were lent to the Company itself in very terms. They were designed to be used for the benefit of the Company, and the intervention of Nelson & Sturges, to see that the manner in which they were applied to the use of the Company was such as would secure the beneficial object of the parties in lending their notes, did not render the notes any less the property of the Company.
It was with reference to the resolution of the 14th of January, and in subordination to its provisions, that the agreement of the 15th was made, and the two together show that it was the design of all parties that the Company should have the notes and indorsements provided for. Those who signed the agreement agreed with the Company, as well as with each other, “ to lend their notes to the amount of $5,000 each to said Companyand the Company agreed that the lenders of the notes should be secured by such an amount of collaterals as Nelson & Sturges should “ think sufficient,” and that Nelson & Sturges might sell the collaterals at public or private sale, if the notes thus lent were not paid by the Company by the 1st of November, 1856, and in the meantime the lenders should renew the notes. The phrase, “ Such paper to be given to T. S. Nelson and J. S. Sturges, special Trustees, to be used by them as they may think proper for the benefit of the Company, and to be made at such date as they require,” did not constitute Nelson & Sturges assignees or transferees of such paper for the use, benefit or security of said Company, in any such sense as is contemplated by and prohibited in section 7 of the statute. It designates Nelson & Sturges as persons to whom the notes may be delivered in order to make a delivery of them to 'the Company. It designates them as persons authorized by the Company to call for the notes agreed to be lent, and for new notes to renew those so lent. But the Company did not thereby intend to devolve upon Nelson & Sturges the sole and unlimited discretion and authority to use the notes as they saw fit, and certainly not to vest in them the title to the notes. By the resolution of the 14th, the officers of the Company were authorized to arrange for the making and *174 indorsing by individuals of “such paper as it will be necessary for the Company, from time to time, to have;” and by the agreement of the 15th, the subscribers agreed to “ lend their notes to said Company.” It would be a very strict construction, and one subversive of the evident design and purpose of the parties, to hold that the Company deprived itself of the power to direct the use to be made of the notes lent, while it in terms agreed to pay them, and gave security for the performance of th^t agreement.
The lenders undoubtedly agreed that any use might be made of the notes which Nelson & Sturges might “ think proper for the benefit of the Company.” And it may perhaps be conceded that the Company agreed that no use should be made of the notes which Nelson & Sturges should think not proper for the benefit of the Company. But that is quite different from divesting the Company of the title to the notes, or vesting it in Nelson & Sturges, or depriving the Company of all power of legal control or direction over the notes or the use which should be made of them. In this construction of the agreement, it might happen that, the Company and Nelson & Sturges disagreeing, the loan would fail to serve any useful purpose; but if it did, the only result would be that the notes would be returned to the lenders, and their claim to the collateral securities would be at an end.
Again, the statute prohibition fails to reach this case, because it was a mere loan of the credit of the various subscribers to the agreement, to be used in such manner as Nelson & Sturges should approve; and against any loss by reason thereof, the parties were to be indemnified by the Company by its paying the notes lent. Now, the statute has no application to such an arrangement. The lenders had a perfect right to annex such conditions and qualifications to the use which should be made of their credit as they saw fit, and the Company might agree that no other use should be made of that credit. The arrangement might, or might not, be beneficial. The Company might, or might not, be able to use the credit in conformity to the conditions imposed; but, if not, then all that can be said is, that the arrangement failed of its end, and the notes would be returned to the lenders.
In this particular case, it was a useful arrangement, and it produced the money which was received by the Company and applied to the payment of the debts of the Company, and, as we think, *175 left the Company, in every aspect, bound for its repayment and the collateral securities well pledged for the performance of the obligation. The claims of those who lent their notes is as meritorious as if they had themselves procured the notes to be discounted and lent the money to the Company without its passing through the hands of Nelson & Sturges. The Company and its creditors have been as much benefited by the transaction in the one form, as if it had been done in the other. And we do not perceive that any rule of law, least of all the section of the statute referred to, (§ 7,) stands in the way of the lenders insisting upon enforcing payment of the collaterals on the faith and security of which they lent their notes.
If anything further was wanting to show that this transaction is not within the prohibition of the section of the statute cited, (§ 7,) it is made quite clear by reference to the design and object of the section, which is, as stated by Mr. Justice Seldeh, “ to prevent the property of the corporation from being placed beyond the control of its Board of Directors,” (Leavitt v. Blatchford, 17 N. Y., 554;) and this, and the 8th section, “ were intended for the protection, not only of creditors, but of stockholders also.” Here was no removal of the property of the corporation from their control. It would be a perversion to say that the borrowing of the notes in question, receiving the full proceeds thereof when discounted, and securing the repayment by a proper amount of collaterals in good faith and without any collusion or fraudulent intent, was putting the property of the corporation beyond its control.
So, also, we think it is a perversion of the true meaning of the agreement to argue that it authorized Nelson & Sturges to take an unlimited amount of the assets of the Company and dispose of them. It only required, and only stipulated, that such an amount of collaterals should be deposited with Nelson & Sturges as they, acting in this regard as agents for the parties to be protected, might deem sufficient to cover the amount of paper advanced. Here is no latitudinarian discretion given to take assets of the Company without limit. The Company were bound, and only bound, to give assets reasonably sufficient to cover the liabilities incurred by the lenders; and the terms of the instrument would be so construed.
*176 But it is again said, that the trust is void because the Atlas Insurance Company had no power to borrow notes. We are pointed to no rule of law and no authority for the proposition that a corporation may not receive the note of a person desiring to aid it, cause it to be discounted, apply the proceeds, to the proper purposes of its business, (as by paying its just debts,) and do all this under an express agreement to refund the amount or to pay and return the note borrowed. The note of the present defendant was a subscription note, given in advance for premiums. It was a note held by the Company, under the 12th section of its charter, by which the Company was authorized to negotiate such notes for the purpose of paying claims or otherwise in the course of its business. Instead of causing this note to be discounted, the Company deposited it as security for other notes which were discounted, and the money duly applied to the proper business of the Company. There was no want of power in the Company to raise money for such a purpose. The substantial result was the same as if the note had been negotiated absolutely. The liability of the Company was thereby made no greater than if the note had been negotiated or discounted with the Company’s indorsement. In this we perceive no excess of power, but rather an exercise of power plainly conferred, if in truth it was not possessed by the Company independent of the provisions of the 12th section of the charter. (Bank of Genesee v. Patchin Bank, 13 N. Y., 309; 19 id., 312; Marvine v. Hymers, 12 id., [2 Kern.,] 223; Central Bank of Brooklyn v. Lang, 1 Bosw., 202; Ogden v. Raymond, Gen. Term, May, 1859.[1])
The only remaining point which, it seems to us, to be material to consider, is, the objection that the transfer of this note to Kelson & Stages was void because the agreement in pursuance of which the transfer was made was in violation of section 8 of the statute above referred to, which forbids the transfer of assets to an amount exceeding $1,000, without a previous resolution of the Board of Directors.
The first and most obvious answer to that suggestion is, that the transaction was distinctly authorized by the Board of Directors, by the resolution of the 14th of January. If it were otherwise, it is gravely questioned whether the authority of the 12th *177 section of the charter does not obviate the force of the 8th section in reference to such notes as the present. But, in our opinion, the resolution of the Board did sufficiently authorize the officers of the Company to deliver the note as security for the notes loaned and the money received thereon; and especially so when considered in connection with the previous resolution of the 80th of November, 1855, which directed the officers to proceed with the subscription notes to liquidate the indebtedness of the Company. The argument proceeds upon the idea that the agreement authorized Nelson & Sturges to take an unlimited amount of the assets of the Company, whether the officers of the Company assented or not, or whether the officers deemed the amount reasonable in reference to the amount of loan to be secured or not. This construction has already been considered, and rejected. The officers of the Company were authorized by the Board to give such security as they thought proper; and the just construction of the agreement is, that they would place in the hands of Nelson & Sturges an amount which they might reasonably deem sufficient to cover the paper loaned to the Company.
In conclusion, we are satisfied that there is no just ground for impeaching the right of Nelson & Sturges, or of the plaintiff as their transferee, to collect the note now in suit, the Company having had the full benefit of the money the repayment of which it was pledged to secure, that money having been applied by the Company to its lawful and proper purposes, and not having been repaid.
The judgment must be affirmed.
Judgment affirmed.

 Ante p. 16.