Dissenting Opinion.
The opinion of the Court was delivered by
Levy, J.
The opinion and decree rendered by the majority of the Court in this case, does not meet with my concurrence, and I therefore respectfully dissent therefrom.
The defense is based upon an alleg-ed vitiation of the policy, growing out of fraud, false swearing and misrepresentations by the insurer, as to the loss sustained by Mm under the policy, the same being intentional and relating to material points.
Defendant urges, and I think properly, that an assignee of a policy, whether before or after an adjustment of loss, stands in no better position than his assignor, and that when the hooks of the assured become absolutely necessary in the course of an investigation, and are withheld or not produced by the assured, the Court will presume against the assured, unless a satisfactory explanation is given for their non-production. I do not think that in this case the explanation removes the suspicion of these books being purposely withheld, or, at least, most carelessly and indifferently kept.
Plaintiff contends, that defendant 'is estopped from setting up the forfeiture of the policy sued upon, by the adjustment of the loss thereunder, and because of the written and oral statements and representations made by its president to the plaintiff before the latter took an assignment thereof. Also, that when a debtor acknowledges that a debt about to be assigned is due, without any allegation of defense, *241 he shall not be permitted to make a defense against the assignee; and this, -whether Ms silence proceed from ignorance or design; and where there is a statement of a single contingent ground of defense, the debtor is to be confined, as against the assignee, to the ground of defense stated, and cannot be permitted to urge any other. And, that a presumption of fraud cannot arise from a mere act, the effect of which was not and could not be injurious;
As stated, the defense is based upon an alleged vitiation of the policy, and error in the judgment, growing out of fraud, false swearing and misrepresentations by the insurer, as to the loss, as stipulated in the policy, the same being intentional and on material points.
Defendant urges, that an assignee of a policy, after an adjustment of loss, stands in no better position than his assignee.
I think the defendant was not estopped from pleading or availing himself of the defense, that the adjustment acknowledged was fraudulent, and therefore inoperative, and that he is not precluded by reason of his previous acknowledgment of the adjustment. This endorsement-in favor of Martin did not estop the Company from urging the forfeiture of the policy, on account of fraud and misrepresentation, a false swearing subsequently discovered, and I do not think that Martin’s transferree or assignee was in better condition in that regard than Martin himself.
“ When a claim has been adjusted and the amount of the loss agreed upon between the assured and insurers, or their agent, disputes may arise how far the adjustment is binding upon the insurers, before payment. This question has been the subject of numerous cases in marine insurance, in which it has been held, that the adjustment is nothing more than a promise to pay, which is only binding when founded on the consideration of a previous liability. ‘What,’ it is said, ‘ is an adjustment ? ’ ‘An admission, on the supposition of certain facts stated, that the assured are entitled to recover on the policy.’ An underwriter must make a strong case after admitting his liability, but until he has paid the money, he is at liberty to avail himself of any defense -which the facts or the law of the case will furnish,” Wood on Insurance, § 468,
■“ The fact that the loss has been adjusted by the insurers, does not necessarily entitle the assured to receive that amount. The adjustment of itself merely amounts to an admission, on the part of the insuree, that the sum fixed is due, if the insured is entitled to have anything under the policy, and does not estop the insured from setting up fraud upon the part of the assured, or a breach of any of the conditions of the policy, that operate to defeat any insurer’s liability.” Id,. § 456.
*242 The policy and the adjustment thereon were not negotiable, and in view of the testimony, I cannot treat this endorsement as unconditionally binding the Company and cutting off its defenses; nor can its defense be confined to the single contingency contended for by plaintiff.
Indeed, I regard the mention of the contingency of “ tho assured setting iiro to the premises,” as being simx>ly an illustration, oías intimating one cause out of othors which would vitiate the policy, and which are set forth in the instrument itself on which the loss should be paid, and by which defendant’s responsibility was governed, and not binding him irrevocably, even if it should be afterwards discovered that the acknowledgment was induced by fraudulent representations.
This case, to my mind, is narrowed in its.consideration to the decision of the question, whether -or not there was on the part of Martin, the assured, in whose favor the adjustment was made, “fraud, or attempt at fraud, by false swearing or otherwise,” which if committed, under tho terms and stipulations of the policy, would cause a forfeiture of all olaims on the Company under said policy. Upon the solution of this question depends plaintiff’s claim and right of recovery.
The propriety, and even the necessity of-the insertion of stipulations, in plain words, the violation- of which operates-as a forfeiture of the policy, are in the interest of business and-'fair dealing, and intended as a protection to all parties interested, the insured as well as the insurer. .Perspicuous and unmistakable, they strike tho- attention and require observance under the clearly expressed penalty of forfeiture of any rights growing out of the policy or contract of insurance, Pure morals, commercial integrity, good faith and honest dealing, all inquire that in such matters, the terms of the agreement should be strictly complied with and all its requirements rigorously exacted. Truthfuln.ess. and good faith are of the essence of contracts of insurance.
To reach a proper and just conclusion, I -have-'given to the .voluminous transcript, much of which is taken up with the examinations and cross-examinations of an army of witnesses, a patient and careful, although tedious investigation.
It is a delicate task to analyze conflicting testimony and reach a just conclusion, where the statements of witnesses on the same points vary, and in some instances are entirely contradictory.
In this case the Record discloses that the sworn statement and affidavit of loss made by the insured, Martin, on lltli of June, 1875, do not truthfully set forth the quantity of sugar destroyed by fire, on the burnt premises. There Avere not 124 hogsheads of sugar in tho warehouse belonging to Martin at the time of Are. In the subsequent-statement made by Martin, he shows the total quantity of his sugar *243 stored in tlie warehouse between the 15th of May and 8th June, both inclusive, to be 117 hogsheads and 20 barrels, from which deduct 34 hogsheads and 7 barrels, and there remained on the 8th of June, 83 hogsheads and 13 barrels, but Mr. Martin appends a note to this statement, as follows : “ Of the 83 hogsheads of sugar, 12 hogsheads were barrelled, making no change in my stock, except reducing the number of hogsheads to 71, and the difference, 12 hogsheads, being represented by ñfty-two barrels of brown sugar.”
The facts elicited in regard to the twelve hogsheads pledged to Mr. Matlié and withdrawn by Mr. Martin from the sugar shed some time after the 8th of June, show that Mr. Martin’s representations in regard to these twelve hogsheads being part of the sugar insured and consumed by lire, are not correct and truthful.
The testimony of P. R. Canton, before a Justice of the Peace, shows that between half-past one and two o’clock on the day of the 8th of June, he was at Mr. Martin’s warehouse, and that he then counted fifty-two hogsheads of sugar, all the hogsheads in the warehouse, of which Martin stated 49 hogsheads belonged to P. N. Canton, and the remaining three to himself, (Martin). Martin stated then, that the remainder of Canton’s sugar was in the sugar sheds, and that he would have it removed to the warehouse, and later in the day, at half-past five o’clock in the afternoon he told witness it had been thus removed. At that time there should have been 81 hogsheads of sugar in the warehouse belonging to Canton.
P. N. Canton also testified that Martin had in his hands 81 hogsheads of sugar belonging, to'him (Canton).
The testimony fails to satisfy me that there was hauled to the warehouse on the 8th of June, a quantity of sugar sufficient to make up the 81 hogsheads of Canton and the 83 hogsheads of Martin, which, in his last statement, Martin claims to have been in the warehouse. The witnesses on behalf of the plaintiff testify vaguely and indefinitely on that point and fail to convince me. The witness, Paul Lusey,' says that he thinks, about 3 o’clock in the afternoon of the 8th, there were about 100 hogsheads of sugar in the warehouse, but that he did not count it. The other witnesses for the plaintiff, so far as relates to the quantity of the sugar, are vague in their statements, and are mere estimates, without having made an actual count. The testimony of the clerk, Dussumier, and Francis Martin, is in direet conflict with that of Canton, and even if correct, conflicts with Martin’s own statement in his preliminary proofs of loss. Having definitely ascertained the exact quantity of sugar in the warehouse on the day when it was turned over by Fitz to Martin, and it being incumbent upon the assured to make proof of his loss with certainty, or at least with an approximation to *244 certainty, it strikes rae that it was within the power of Martin to show, having on hand 79 hogsheads on the 15th of May, about which there seems to be no doubt, what additional sugars lie received, and what he sold or removed from the warehouse between the 15th of May and the 8th of June, and thus, with mathematical certainty, would have appeared the total quantity on hand, and to whom and in what proportions the total belonged. The representations and sworn statements of Martin are contradictory; thoy are not sustained by the facts, as elicited subsequent to the adjustment. Was there then such “ fraud, or attempt at fraud, by false swearing or otherwise,” as would cause a forfeiture of all claim under the policy?
The stipulations in this regard are precise, the reason therefore is sound, and strict compliance therewith, in all material points, essential to entitle the assured to avail himself of the benefits of the contract. Tho elements of the contract are good faith and strict truthfulness; tho observance whereof, in the very nature and character of the contract is material. It matters not whether the misrepresentations and 'false statements and affidavits were calculated to impose greater or less loss on the insurer, or to enure to the advantage or disadvantage of the assured, if made knowingly and with fraudulent intent, they operate, of themselves, as a forfeiture of the claim of the assured. All the facts and circumstances developed on the trial of this case in the lower court, as disclosed in the record, lead me to the conviction, that intentional misrepresentation and fraudulent designs were practiced by the assured, in the manner alleged by the defendant, and thus vitiated the policy of insurance, and the adjustment itself basod thereon, and plaintiff, as assignee hasno better rights as to recovery than hisassignor, the assured. Plaintiff relies very earnestly upon the endorsement of Mr. Fourchy, as binding the Company, and as constituting a strong if not controlling reason for his purchase of the claim from Martin. With such contradictory statements in regard to tho conversations had between Mr. Godchaux and his clerk, on the one hand, and Mr. Fourchy, the president, and the secretary of the Insurance Company, ou the other, with no impeachment or attempt at impeachment of the credibility of any of tliese witnesses, in order to arrive at a proper decision thereon, and to give weight to the one or the other, it is proper and. reasonable to consider all the circumstances attendant upon the transaction. Tt strikes me as strange and inconsistent, that in view of the reliance which the plaintiff contends he placed upon the statement of Mr. Fourchy, the faith which heroposed upon his alleged representations, and the controlling influence which they exercised upon him, and which led him, in view of his understanding of, and confidence in tho alleged assurances, to make a large investment of his moneys in this *245 claim, lie should discount what he considered a valid claim against a corporation of undoubted solvency and high financial standing, having only about sixty days to run, before, as ho believed, it would be paid in full, at the enormous discount of about 56 per cent, per annum. This, to say the least of it, may, without any satisfactory explanation, be regarded as inconsistent with plaintiff’s declaration in his testimony : “ I discounted the policy and took all the pains to see that it was good, be sure that it was good.’’
But, even if Mr. Godehaux’s and Mr. Gauthier’s recollection is correct, and Mr. Fourchy’s is at fault, had Mr. Fourchy the right to bind the Company 1 To admit the right of the president to bind a corporation, without authority from the corporation itself, or its directory to whom, under its charter, such authority, with the right to delegate, is given, is a dangerous doctrine. To recognize this right in an agent or ministerial officer of a corporation, would be to place its stockholders and their capital at the mercy of an individual, who, without warrant or special authority, might, by a stroke of his pen, involve it in ruin. There is no proof to show that Mr. Fourchy was clothed with such authority, and it is not to be presumed. Greenleaf on Evidence, vol. i.; Paley on Evidence, Ch. 3, part 2; Parsons on Shipping, vol. i.; 17 Mass. 1; Green’s Brices Ultra Vires, p, 390,
I do not think that the acceptance by Mr. Fourchy of the adjustment, even if he had the authority to do so, was conclusive, and operated as an estoppel on the Company, but do think it -would be inoperative, if given in error and fraud, and would fall, if these or either were established. See Arnold on Insurance, 996, 999,1003 ; 9 A. 590; Phillips on Evidence, Ed. 1867, $§ 1815, 1816, 1817. I think that fraudulent and false statements were made by the assured, which induced the acknowledgment of the adjustment, and it, therefore, does not bind the company and cannot be treated as an estoppel.
Parsons on Contract, Vol. 2, p. 556, 6th Ed., says; - “Adjustments * * * may be avoided by a party defrauded, if they were made fraudulently, nor are they ¿nfbrced if founded upon a material misrepresentation or concealment, or a material mistake of fact, or, we think, of law. But the distinction of the common law between these two mistakes is still so far applied, that if money be actually paid under an adjustment, it may be recovered back, if paid through a mistake of fact, but not if paid through a mistake of law.”
In 9 A. 590, the Supreme Court held : “ A policy of insurance and the adjustments thereon, even if subscribed by the plaintiff to be right, is not negotiable, and if it is assigned, the assignee takes it subject to all equitable defenses against the assured. An adjustment signed by *246 the insurance in ignorance of fraud, practiced by the assured, which would avoid the policy, must be set aside.”
Por these reasons, I feel constrained to dissentfrom my brethren constituting the majority of the Court.
Rehearing refused.
Justices Todd and Levy dissent, considering that a rehearing should be granted.